KENNETH M. MILLER (SBN 151874)
Ken@KMMillerLaw.com
26944 Camino de Estrella, Suite B
Capistrano Beach, California 92624
Phone: 949-388-3440

RICHARD G. NOVAK (SBN 149303)
Richard@RGNLaw.com
P. O. Box 5549
Berkeley, CA 94705
Phone: 626-578-1175; Fax: 626-685-2562

**Attorneys for Defendant**

**CARLOS GONZALEZ**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **BEFORE THE HONORABLE GEORGE H. WU, DISTRICT JUDGE** |
| Plaintiff, | |
| vs. | **Case No.: CR 18-00172-GW** |
| MICHAEL LERMA, ET AL., | **DEFENDANT CARLOS GONZALEZ' NOTICE OF MOTION; MOTION TO LIMIT THE EXPERT TESTIMONY OF LOS ANGELES COUNTY DEPUTY SHERIFF DEVON P. SELF, AND FOR EVIDENTIARY HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL AND EXHIBITS THERETO** |
| Defendants. | |
| | **DATE OF HEARING:  02/03/25** |
| | **TIME OF HEARING: 8:00 A.M.** |

//

//

//

# NOTICE OF MOTION

TO THIS HONORABLE COURT, THE UNITED STATES OF
AMERICA AND ITS COUNSEL:  PLEASE TAKE NOTICE THAT on
February 3, 2025, defendant Carlos Gonzalez, by and through his
counsel of record, Kenneth M. Miller and Richard G. Novak, will and
hereby does move this Court for an order limiting the expert testimony
of Los Angeles County Deputy Sheriff Devon P. Self, and for an
evidentiary hearing concerning the sufficiency of the bases for his
proffered opinions.

This motion is based upon the attached memorandum of points
and authorities, declaration of counsel and exhibits thereto, and any
other matters that the Court may consider at the hearing on this
motion.

The parties met and conferred on January 3, 2025 concerning the
matters addressed in this motion and, as to the specific evidentiary
issues raised below, were unable to resolve their disputes.

Dated: January 6, 2025              Respectfully submitted

                                    /s/ Richard G. Novak
                                    Richard G. Novak
                                    Kenneth M. Miller
                                    **ATTORNEYS FOR DEFENDANT
                                    CARLOS GONZALEZ**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

I.      INTRODUCTION ...................................................................1

II.     THE LAW CONTROLLING THE ADMISSIBILITY OF
        EXPERT TESTIMONY ...........................................................6

III.    WITH MINOR EXCEPTIONS, DEPUTY SELF'S *EXPERT*
        OPINIONS CONCERNING THE "MICHAEL LERMA
        CELL" ARE NOT ADMISSIBILE, REGARDLESS OF THE
        SUFFICIENCY OF THE BASES FOR HIS OPINIONS ............15

IV.     AN EVIDENTIARY HEARING IS NECESSARY IN ORDER
        TO DETERMINE IF DEPUTY SELF HAS A SUFFICIENT AND
        RELIABLE BASIS FOR EXPRESSING THOSE EXPERT
        OPINIONS WHICH ARE ADMISSIBLE ...............................21

i

# TABLE OF AUTHORITIES

## Cases

*Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998)..............6

*Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).........6

*Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177
(2004)...................................................................... 10

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n. 10 (1993)....5

*Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316
(9th Cir. 1995)............................................................5

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ..............................6

*Jetcraft Corp. v. Flight Safety Int'l,* 16 F.3d 362, 366 (10th Cir.1993)....6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ....................4

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir.
2014)......................................................................6

*United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973)..............7,13

*United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)..................4

*United States v. Campos*, 217 F.3d 707, 711 (9th Cir. 2000)..................9

*United States v. Cervantes*, No. CR 12-792 YGR, 2016 U.S. Dist. LEXIS
15837 (N.D. Cal. Feb. 9, 2016) ..........................................10,11,12,13

*United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002)........... 9

*United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004)..............6

*United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)..............12

*United States v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir. 2002)...........6

*United States v. Holguin*, 51 F.4th 841,853 (9th Cir. 2022)............... 5,19

*United States v. Mejia*, 545 F.3d 179, 190–191 (2d Cir. 2008)...........7,13

*United States v. Morales*, 108 F.3d 1031, 1033,1036,1037,1038 (9th Cir. 1997)........................................................................................8,9

*United States v. Rodriguez,* 125 F. Supp. 3d 1216, 1248–49 (D.N.M. 2015)........................................................................................7,13

*United States v. Valencia-Lopez,* 971 F.3d 891, 900 (9th Cir. 2020).......6

*United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014)................12

### Statutes

18 U.S.C. §1961(4)............................................................................4

### Rules

Fed. R. Crim. P. 16 ........................................................................4

Fed. R. Evid. 702 .............................................................. *passim*

Fed. R. Evid. 704(b) ...................................................................8,18

### Constitutional Provisions

U.S. Const. Amend VI ..................................................................10

### Other Authorities

29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and
        Procedure* § 6268 (2d ed.).........................................................5

Fed. R. Evid. 702 advisory committee's note (2000 Amendment)..........6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

### Introduction

Trial in this matter is scheduled to begin on February 25, 2025. Four defendants, each of whom is named in the First Superseding Indictment (the "FSI") returned in October 2021, are joined for trial. Those four defendants are Michael Lerma ("Mr. Lerma"), Carlos Gonzales ("Mr. C. Gonzalez"), Juan Sanchez ("Mr. Sanchez"), and Jose Valencia Gonzalez ("Mr. J.V. Gonzalez").

On December 3, 2024, the government timely disclosed (per this Court's Scheduling Order, Doc. No. 1207) a letter setting forth its intention to call as an expert witness at trial Los Angeles County Deputy Sheriff Devon P. Self ("Deputy Self"). The letter sets forth his proffered opinions and purports to set forth the bases for those opinions. His C.V. was provided as well. (Novak Decl. Ex. A)

Generally speaking, the government describes Deputy Self:

> as an expert on the Mexican Mafia, specifically, the history, structure, organization, methods, purpose, and activities of the Mexican Mafia., also known as the EME, in general, the Michael Lerma Cell of the Mexican Mafia more specifically, and drug trafficking and taxation by the Mexican Mafia, generally, and the Michael Lerma Cell, more specifically. (Ex. A. at 2)

The government's distinction between Deputy Self's opinions concerning the Mexican Mafia *generally* and what it calls the "Michael Lerma Cell" *specifically* is significant because this is the demarcation

1  line between expert testimony that is and is not admissible, as set forth
2  more fully below.

3      Importantly, Count One of the First Superseding Indictment
4  ("FSI") specifically alleges that these four defendants and others are
5  members or associates of an organization described as "the Michael
6  Lerma Cell of the Mexican Mafia." (FSI at 7-8, ¶¶2-3) The FSI alleges
7  that the "Michael Lerma Cell" is *the* unlawful racketeering enterprise
8  pursuant to 18 U.S.C. §1961(4). Count One of the FSI alleges with
9  specificity the conduct of the "Michael Lerma Cell" which renders it an
10  unlawful racketeering enterprise. (FSI at 9-15, ¶¶ 8a-i) The FSI further
11  alleges with specificity the "purposes" of the enterprise defined as the
12  Michael Lerma Cell, as well as its "means and methods." (FSI at 14-15,
13  ¶¶ 9-10)

14      In an effort to comply with the new more rigorous requirements in
15  Rule 16 for expert disclosures, the government sets forth in the balance
16  of its disclosure letter what it refers to as a "complete statement" of
17  Deputy Self's opinions. (Ex. A. at 2) These opinions are broken down into
18  numerous categories and sub-categories, a framework which again
19  points the Court to point where proper expert testimony begins and
20  where it ends.

21      The first category (Section A) of subject matter as to which the
22  government proffers Deputy Self's expert testimony is "**The Mexican
23  Mafia Generally**." (Ex. A. at 3) This category is broken into five sub-
24  categories, as follows:

25      1) Formation of the Mexican Mafia;

26      2) Structure of the Mexican Mafia and Control of Custody Facilities
27  and Neighborhoods;

28      3) Mexican Mafia Rules and Discipline;

4) Symbols Used by the Mexican Mafia and Mexican-Mafia Affiliated Street Gangs, and

5) Mexican Mafia Drug Sales Within State Prisons, County Jail Systems, Federal Detention Facilities and on the Streets. (Ex. A. at 2-8)

The second category (Section B) of subject matter as to which the government proffers Deputy Self's expert testimony is **"The Michael Lerma Cell of the Mexican Mafia and the Charged Conduct more Specifically."** (Ex. A. at 8) This category is broken into nine sub-categories as follows:

1) Formation of the Michael Lerma Cell of the Mexican Mafia;

2) Means and Methods of the Michael Lerma Cell of the Mexican Mafia;

3) Overall Structure of the Michael Lerma Cell;

4) Control of Activities in Pomona;

5) Control of Activities in Calipatria;

6) Control of Activities at MDC;

7) Collaborative relationship with LACJ Enterprise;

8) Symbols, Names, etc. of the Michael Lerma Cell and its affiliated Street Gangs, and

9) Meaning of Specific Pieces of Coded Language. (Ex. A. at 8-16)

It is important to observe here that most of the sub-categories of opinion with respect to the "Michael Lerma Cell" track the sections of the FSI summarized above. As explained below, expert opinion that these fact-specific allegations in the FSI are true is clearly inadmissible and must be excluded.

A third category of opinions of Deputy Self is described as **"Knowledge Regarding Mexican Mafia's and Michael Lerma Cell Enterprise's Racketeering Activities."** (Ex. A at 16) While it is

difficult for undersigned counsel to understand how the single paragraph which purports to provide more specificity on this topic does so, it does disclose that "Deputy Self will opine as to *particular mental states* of people in certain roles in the Mexican Mafia." (Ex. A. at 16) Presumably, based on the heading, this includes inadmissible expert opinion evidence concerning the "mental states" of the defendants in this case, since the header refers to the "Michael Lerma Cell Enterprise's Racketeering Activities."

Finally, the disclosure letter purports to disclose the "bases and reasons" for Deputy Self's opinions. (Ex. A. at 16) As explained below, the very general statement of the bases and reasons for his opinions is wholly untethered to the specific opinions proffered in the letter, requiring either further written disclosures or an evidentiary hearing to assess if Deputy Self in fact has sufficient bases for the very specific opinions the government has proffered.

## II.

## The Law Controlling the Admissibility of Expert Testimony

### Rule 702

The district court has a "special obligation" to serve as a gatekeeper for expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Testimony is properly characterized as "expert" if it concerns matters that the average juror is not capable of understanding on his or her own. *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."). When faced with a proffer of expert testimony, the court must determine whether:

(a) scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702(a)–(d).

The proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n. 10 (1993).

While evidentiary hearings on expert testimony are not required, in a recent case reviewing the admission of expert testimony concerning a criminal organization, the Ninth Circuit explained that without "some proceeding, focused on the reliability of expert testimony, such as a *Daubert* hearing . . . it may be difficult in many cases for the district court to clearly discern an expert's methodology and to evaluate how that methodology connects to the expert's opinions." *United States v. Holguin*, 51 F.4th 841,853 (9th Cir. 2022).

Under Rule 702(b), expert testimony must be "based upon sufficient facts or data."  "The question is whether the expert considered enough information to make the proffered opinion reliable." 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268 (2d ed.). To determine the reliability of proffered expert testimony, the district court must "analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). An expert's opinions are not reliable when the expert bases their conclusions on "mere subjective

beliefs or unsupported speculation." *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."); *Jetcraft Corp. v. Flight Safety Int'l,* 16 F.3d 362, 366 (10th Cir.1993) (excluding expert testimony as "professional speculation").

A witness "relying solely or primarily on experience" must therefore explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 Amendment). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note (2000 Amendment).

The Government must carry its burden by explaining "how [its proposed expert's] experience led to the conclusion[s] he reached, why that experience was a sufficient basis for the opinion[s], and just how that experience was reliably applied to the facts of the case." *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004). Indeed, "[i]t is well settled that bare qualifications alone cannot establish the admissibility of . . . expert testimony." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (citing *United States v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir. 2002)); *see also United States v.*

1    *Valencia-Lopez,* 971 F.3d 891, 900 (9th Cir. 2020) ("In assessing
2    reliability, the court must not only consider a law enforcement officer's
3    qualifications and experience, but also ensure the officer's general
4    expertise is linked to his proffered opinion").

5        As an expert's purported expertise narrows from general details
6    about an organization to the specific facts of a case, his "testimony
7    becomes more central to the case, more corroborative of the fact
8    witnesses, and thus more like a summary of the facts than an aide in
9    understanding them," transforming the expert "into the hub of the case,
10   displacing the jury by connecting and combining all other testimony and
11   physical evidence into a coherent, discernible, internally consistent
12   picture of the defendant's guilt." *United States v. Mejia*, 545 F.3d 179,
13   190–191 (2d Cir. 2008). "In such instances, it is a little too convenient
14   that the Government has found an individual who is expert on precisely
15   those facts that the Government must prove to secure a guilty verdict . .
16   .." *Id.* at 191; *see also United States v. Rodriguez,* 125 F. Supp. 3d 1216,
17   1248–49 (D.N.M. 2015) ("[A]s the officer's expertise narrows in scope
18   from broad generalities about certain criminal practices—which are fixed
19   in a meaning that transcends the case at hand, and about which the
20   expert knew before his involvement in the case being tried—to practices
21   of which the expert has learned only through his or her investigation of
22   the instant case, there is the danger that the expert is cloaking percipient
23   testimony in the garb of expert opinion")  "Scientific or expert testimony
24   particularly courts" the danger of misleading the jury "because of its aura
25   of special reliability and trustworthiness." *United States v. Amaral*, 488
26   F.2d 1148, 1152 (9th Cir. 1973).

27       The rationale in *Mejia*, *Rodriguez* and *Amaral* was recently applied
28   by District Judge Carney to the government's proposed expert testimony

in a prosecution arising from a Mexican Mafia-related homicide at FCI
Victorville. Judge Carney's opinion in a highly analogous case, *United
States v. Patino, et al.*, CDCA Case No. EDCR 18-00250-CJC, reiterates
the well-established risk that when an expert's opinions get too close to
the elements of the offense and the operative facts alleged in the charging
document, the expert becomes a summary witness for the prosecution.
(Novak Decl. Ex. B. at 11-12, 16-17)

Rule 704(b)

"Federal Rule of Evidence 704(b) precludes an expert, testifying as
to the mental state or condition of a defendant, from stating 'an opinion
or inference as to whether the defendant did or did not have the mental
state or condition constituting an element of the crime charged or of a
defense thereto'." *United States v. Morales*, 108 F.3d 1031, 1033 (9th Cir.
1997). In *Morales,* the Ninth Circuit explains that this limitation is not
only applied to mental health experts but applies to all expert witnesses.
The Court explains, "the 'mental state or condition' refers to that 'of a
defendant in a criminal case.' If that mental state or condition is an
element of the crime charged or a defense thereto, 'no expert witness'
may testify to it, regardless of whether the witness testifying is a
psychiatrist or other mental health expert." *United States v. Morales*, 108
F.3d at 1036.

"A prohibited 'opinion or inference' under Rule 704(b) is testimony
from which it necessarily follows, if the testimony is credited, that the
defendant did or did not possess the requisite *mens rea.*" *United States v.
Morales*, 108 F.3d at 1037. "We have adopted an interpretation of Rule
704(b) that allows testimony supporting an inference or conclusion that
the defendant did or did not have the requisite *mens rea*, so long as the
expert does not draw the ultimate inference or conclusion for the jury and

the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Morales*, 108 F.3d at 1038.

> Expert testimony that compels the jury to conclude that the defendant did or did not possess the requisite *mens rea* does not "assist the trier of fact" under Rule 702 because such testimony encroaches on the jury's vital and exclusive function to make credibility determinations. Specifically, Rule 704(b) 'limits the expert's testimony by prohibiting him from testifying as to whether the defendant had the mental state or condition that constitutes an element of the crime charged." *Morales*, 108 F.3d at 1035.

*United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002).

The broad scope of Rule 704(b) is further explained by the Ninth Circuit in *U.S. v. Campos*. "[T]he rationale for precluding ultimate opinion testimony applies to [] any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven such as premeditation in a homicide case or lack of predisposition in an entrapment case. *United States v. Campos*, 217 F.3d 707, 711 (9th Cir. 2000) (internal quotations omitted).

> Congress added this provision out of a desire to 'eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact.' S. Rep. No. 98-225 at 230-31 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3412-13 ("S. Rep. 98-225"). Thus, with respect to a criminal defendant's mental state, Congress confirmed that 'the *jury* is the lie detector.' *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) (emphasis added).

*United States v. Campos*, 217 F.3d at 711.

<u>Confrontation Clause Issues Implicated by Expert Testimony</u>

Whenever a proffered expert witness may testify about the origins, principles, and activities of a group that has a publicly documented

history, there is a significant risk of violating the defendant's Sixth Amendment rights under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

A memorandum opinion by District Judge Gonzalez Rogers in *United States v. Cervantes*, No. CR 12-792 YGR, 2016 U.S. Dist. LEXIS 15837 (N.D. Cal. Feb. 9, 2016) explains how expert opinions in this area run a serious risk of violating a defendant's Confrontation Clause rights "when he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *24-25.

In that opinion, the district court explained that "the key question for determining whether an expert has complied with *Crawford* is the same as for evaluating expert opinion generally: whether the expert has developed his opinion by applying his extensive experience and a reliable methodology." *United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *25.

> The truth-finding function of a trial is not at risk "if '[t]he jury [is] every bit as qualified to analyze' a piece of mundane evidence as the purported expert," and in that circumstance, "the expert provides no added value on which to be cross-examined," *[United States v.] Garcia*, 793 F.3d [1194] at 1212 [(10th Cir. 2015)] (quoting *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991)). *Cf. [United States v.] Cerna*, 2010 U.S. Dist. LEXIS 62907, 2010 WL 2347406, at *5 [(N.D. Cal. June 8, 2010)]("Juries are good at sorting out the facts, deciding, for example, what, if any structure resides within a particular gang. Juries would ordinarily rely on fact witnesses, such as cooperating witnesses and undercover officers, to supply the facts. They do not need police opinions to do this.").

*United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *25-26.

1       Applying these principles to the government's proffered expert on

2   the structure, beliefs and practices of the Nuestra Familia, the district

3   court explained:

> [T]he government's disclosures for this category
> appear to be solely repeating written or spoken
> hearsay, or testimonial hearsay. The Court finds
> that the experts are not providing their own
> considered opinions in a way that would assist the
> factfinder because each officer seeks to opine about
> specific Nuestra Familia duties, expectations,
> discipline, retaliation, and the like without
> distinguishing among his sources or explaining his
> reasoning with sufficient specificity." *Cf. Vera*, 770
> F.3d at 1237-39 ]; *Garcia*, 793 F.3d at 1212-13. For
> instance, the proffered opinions about Nuestra
> Familia rules would introduce the fact that such
> rules exist and how they operate without
> sufficiently explaining whether the officers
> undertook their own independent analyses of the
> Nuestra Familia "Constitution" and other rules,
> how they applied their experience to reach their
> conclusions, or how such opinions would assist the
> factfinder. (Compare Docket No. 894 at No. 27
> ("One of the primary duties of a member is to 'put
> in work' on behalf of the gang, which means he
> must generate money, normally through criminal
> activity.") with 8/17/15 Disclosure at 3 ("Bylaws
> regarding the goals, purposes, disciplinary
> procedures, and mechanics of operation are spelled
> out.").)
>
> ...
>
> In addition, Garrow refers generally to his
> "experience" and "interviews with members of
> Nuestra Familia, gang drop outs, and informants,
> as well as specific events he has seen unfold."
> (8/17/15 Disclosure at 4.) Livingston also refers to
> prior investigations, "debriefings," interviews with
> gang members and government personnel,
> intercepted communications, and "evidence
> obtained from the execution of search warrants,
> such as money order receipts." (See id. at 5-6.) The
> specificity with which each expert seeks to opine
> combined with the failure to explain his reasoning
> or analysis, or to distinguish among the sources on
> which he relied lead the Court to find that the
> opinions as set out in this category are not
> admissible expert opinions that would assist the
> factfinder in compliance with Rules 702, 703, and
> *Crawford*.

27   *United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at \*26-28. The

28   Court was similarly concerned about the admissibility of proffered expert

opinions concerning the connections between specific individuals and the organization at issue.

> Further, as disclosed by the government, the proffered opinions identifying specific individuals holding positions in Nuestra Familia (Docket No. 894, Numbers 21 and 22) or the fact of occurrences tied to Nuestra Familia (id., Numbers 63, 65-77, 79-81) do not fit into a category of cognizable expertise, do not sufficiently identify reliable bases by which they were reached, and lack indication as to how admitting them would help the factfinder understand the evidence in this case. There is a meaningful distinction between a "sociologist describing the inner workings of a closed community" and "a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *See Mejia*, 545 F.3d at 190. Here, Garrow makes a general reference to "historical, structural and regulatory background" for opinions about the identities of certain leaders. (See 8/17/15 Disclosure at 3.) And similarly, Livingston refers generally to his investigation of Nuestra Familia, interviews, "debriefings," evidence seized, and the Nuestra Familia "Constitution" and rules. (See id. at 5-7.) But neither provides the Court sufficient basis from which to conclude that he applied his knowledge to reach an opinion about matters as specific as identities of Nuestra Familia leaders or the fact of occurrences tied to Nuestra Familia.

*United States v. Cervantes*, 2016 U.S. Dist. LEXIS 15837, at *28-30.

The Ninth Circuit has also explained that "an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)).

//

//

//

**III.**

**With Minor Exceptions, Deputy Self's *Expert* Opinions**

**Concerning the "Michael Lerma Cell Enterprise"**

**Are Not Admissible, Regardless of the**

**Sufficiency of the Bases for His Opinions**

With the exception of certain clearly delineated portions of these sub-categories, Rule 702, as interpreted by *Mejia*, *Rodriguez, Amaral, Cervantes,* and *Patino,* precludes Deputy Self from testifying to the opinions set forth in Section B of the government's notice. Subject to those exceptions, each of these opinions merely summarizes the government's theory of this case and cloaks as expert testimony non-esoteric evidence that should be presented through admissible recordings, documents, and the testimony of lay witnesses.

<u>Sub-category 1: "Formation of the Michael Lerma Cell of the Mexican Mafia"</u>

Sub-category 1, "Formation of the Michael Lerma Cell of the Mexican Mafia" doesn't even purport to present expert testimony in order to assist a jury with matters it would not typically understand. The government proposes that Deputy Self will testify that that Mr. Lerma is a member of the Mexican Mafia, a fact alleged in the FSI, how he "worked his way up to Mexican Mafia Membership" and his control of criminal activities in Pomona. The government proposes that Deputy Self will offer expert opinion testimony as to the roles within the Mexican Mafia of all of the defendants in this trial, and other defendants originally charged in this case. He will also testify, the government proposes, that in his opinion Mr. Lerma controlled Calipatria State Prison. (Ex. A. at 9)

1    Clearly this proposed expert opinion testimony violated Rule 702.
2    One Deputy Self has permitted, as he may if he has a substantial basis
3    for doing, about the general characteristics of the Mexican Mafia, its
4    history, its rules, and its control of neighborhoods and custodial
5    institutions, there is nothing in this sub-category that requires expert
6    testimony, and this type of fact-specific testimony that mirrors the core
7    factual allegations in the FSI is exactly what the case law cited above
8    prohibits.

9    Sub-category 2: "Means and Methods of the Michael Lerma Cell of
10   the Mexican Mafia"

11   The notice of the "opinions" Deputy Self will offer with respect to
12   the "means and methods of the Michael Lerma Cell of the Mexican Mafia"
13   (Ex. A. at 9) doesn't even purport to represent such opinions. It merely
14   quotes from the FSI specific factual allegations. There are no opinions
15   offered here other than, implicitly, Deputy Self's opinion that the
16   allegations in the FSI are true, and the notice doesn't even say that. The
17   government's failure, here, to identify any admissible expert opinions
18   that satisfy the criteria for admissibility in Rule 702 is symptomatic of
19   the entire proffer with respect to the "Michael Lerma Cell"

20   Sub-category 3: "Overall Structure of the Michael Lerma Cell"

21   This sub-category of factual allegations masquerading as expert
22   opinions is also inadmissible under Rule 702. Here, the government
23   proposes, again, to have Deputy Self testify as to the specific roles played
24   by the defendants in this trial in the alleged Michael Lerma Cell, both on
25   the streets and in custody. If, as the notice alleges here, "this was all
26   consistent with general Mexican Mafia practices as set forth in Section
27   I-A-2, above" then it is clear that there is no need for the jurors to receive
28   expert testimony here. (Ex. A. at 10) If the general structure and

1  function of the Mexican Mafia has been established through Deputy
2  Self's testimony, the jury does not need further expert testimony to
3  understand the nature of the FSI-specific allegations.

4        Moreover, the government has noticed its intention to call at least
5  seven cooperating witnesses who were at MDC when the alleged
6  racketeering conduct occurred.  If these witnesses cannot establish the
7  facts alleged here, that is not a permissible basis for the government to
8  call an "expert" to vouch for them, to summarize their testimony, and to
9  place a glossy coat of paint over it.

10        <u>Sub-category 4: "Control of Activities in Pomona"</u>

11        Here, the government proposes that Deputy Self provide expert
12  testimony that the Michael Lerma Cell controlled Pomona and
13  surrounding areas and the profits derived from illegal activities of street
14  gang members in that area.  He would also testify that *charged*
15  kidnapping of C.V. and *charged* attempted carjacking of E.N. and M.A.
16  are "prototypical Mexican Mafia enterprise activities."  (Ex. A. at 10-11)

17        Clearly, this is another example of improper expert testimony that
18  is not necessary nor permitted by Rule 702.  It is another example of the
19  government seeking to use an expert to testify that core factual
20  allegations in the FSI are true.

21        The government has available to it the testimony of percipient law
22  enforcement officers, seized physical evidence, and one victim.  It will
23  also seek to admit the prior sworn testimony of a victim and a percipient
24  witness.  Expert testimony is not to be used to fill gaps, if any, in the
25  government's evidence where it does not otherwise qualify under Rule
26  702.  All of this proposed expert testimony is inadmissible.

27  //

28  //

1     <u>Sub-category 5: "Control of Activities in Calipatria"</u>

2     The proposed expert testimony under the rubric of "Control of

3  Activities in Calipatria" breaks down into two distinct pieces, one of

4  which is and one of which is *not* proper testimony from Deputy Self.  It

5  appears that the government intends to have him interpret telephone

6  calls and texts in and out of Calipatria between someone described only

7  as a "shot caller" and Cheryl Perez Castaneda who the government

8  alleges was a "secretary" to Mr. Lerma.  To the extent that he has a

9  sufficient foundation to do so, expert interpretation for the jury of what

10  may be coded conversations among specific co-conspirator statements is

11  proper.  However, Deputy Self's expert opinion that the Michal Lerma

12  Cell controlled Calipatria and *why* funds were placed on Mr. Lerma's

13  inmate trust account is not proper expert testimony.

14     <u>Sub-category 6: "Control of Activities at MDC"</u>

15     The proposed expert testimony is perhaps the most egregious

16  misapplication of Rule 702 in the government's entire notice.  The

17  government proposes that Deputy Self testify, as an expert, that all of

18  the core allegations in the FSI concerning the foundational events

19  which led to the murder of S.B. are true.  The proposed expert

20  testimony would tie together and vouch for, in a nice clean uniformed

21  package, the testimony of no less than seven cooperating witnesses who

22  were housed at MDC, testimony of BOP employees who have percipient

23  knowledge of how the Mexican Mafia may have operated within MDC,

24  and other evidence available from documents, recorded telephone calls,

25  and other non-expert forms of evidence.  His proposed testimony that

26  "Lerma would select those who could enforce the enterprise's debt

27  management" (Ex. A. at 11) is a glaring example of how this proposed

28  testimony violated Rule 702.

1    Sub-category 7: "Collaborative Relationship with LACJ
2    Enterprise"

3    This noticed area also presents a mix of opinions admissible and
4    inadmissible under Rule 702.  (Ex. A. at 12-13) Much of it describes the
5    custodial operations of the Los Angeles County Sheriff's Department,
6    and how the Mexican Mafia, generally, controls county jail facilities or
7    portions of them.  It also describes, generally, the telephone recording
8    systems in the jail, the role of "kites" distributed inside and outside
9    jails, and how in-person visits to inmates can facilitate communication
10    among Mexican Mafia members and associates.  This type of
11    foundational testimony, if Deputy Self has a proper basis for offering it,
12    does not offend Rule 702.

13    However, embedded in these unobjectionable foundational facts
14    are case-specific facts which are not proper territory for Deputy Self.
15    The government proposes that he testify that a specific co-defendant in
16    this case was a shot caller for the Michael Lerma Cell and that the
17    extortion/carjacking crimes alleged in the FSI were committed by
18    members of the Michel Lerma Cell enterprise.  These opinions are not
19    proper under Rule 702.  The government has other admissible forms of
20    evidence, as described above, it can utilize in its effort to prove these
21    overt acts and the elements of the analogous substantive offenses.

22    Sub-category 8: "Symbols, Names, etc. of the Michael Lerma Cell
23    and Its affiliated Street Gangs"

24    While much of the proposed expert testimony set forth here (Ex.
25    A. at 13) is unobjectionable, this portion of the notice does raise an
26    overarching admissibility concern that infects all of Deputy Self's
27    proffered opinions.  Which gangs operate in Pomona, what their

28

1  symbols are, and how tattoos signal loyalty is proper testimony under
2  Rule 702 where a proper foundation has been laid.

3          That said, aside from the grand jury's allegation here that there is
4  such a thing as the "**Michael Lerma Cell of the Mexican Mafia**"
5  there is no historical basis for Deputy Self to testify that in his opinion,
6  it is an entity which pre-existed the coining of that phrase in this
7  prosecution.  There is no doubt, historically, that the Mexican Mafia is
8  an organization.  Whether or not there is an organization known as the
9  Michael Lerma Cell and, if so, whether or not it meets the definition of
10  an enterprise under federal racketeering law is not a question for an
11  expert.  It is a question for the jury.  There should be no testimony from
12  this expert witness or any other witness which purports to tell the jury
13  that there is an enterprise known as the Michael Lerma Cell.  That is a
14  fact of consequence for the jury to decide.

15          Sub-category 9: "Meaning of Specific Pieces of Coded Language"

16          Here, the government proposes that Deputy Self will testify about
17  jail calls made by the defendants in this case and others connected to it,
18  in order to explain the meaning of "coded" language.  (Ex. A. at 13-16)
19  To the extent that his testimony is limited to explaining the meaning of
20  phrases that would not normally be understood by jurors, and that his
21  testimony is based upon a sufficient foundation, it is largely
22  unobjectionable as outlined here.  There are a few exceptions, such as
23  his proposed testimony that the Cherryville gang is "loyal to the …
24  Michael Lerma Cell Enterprise," testimony which, as described above,
25  invades the province of the jury to decide if such a thing actually exists.
26  //
27  //
28

<u>Section C: Knowledge Regarding Mexican Mafia's and Michael Lerma Cell Enterprise's Racketeering Activities</u>

Notwithstanding undersigned counsels' efforts during the meet and confer process to better understand what opinions are being offered here, it remains elusive.  It appears that the government proposes that Deputy Self testify as to the mental states of the defendants and others, which is clearly not an area for expert testimony under Rule 704(b) and as to which he likely does not have a proper foundation in any event.

It also appears that he would testify that it is his opinion that the defendants in this case and others by default are on notice and actually know that the Mexican Mafia engages in the predicate crimes that constitute a racketeering enterprise, such as murder, extortion and other acts of violence.  This is also improper under Rule 702.  The proposed expert testimony here also includes why people, generally, pass messages for the Mexican Mafia (Ex. A. at 16) This is the only opinion in this section which appears to be admissible, assuming there is a sufficient foundation for it.

**IV.**

**An Evidentiary Hearing is Necessary in Order to Determine if Deputy Self Has a Sufficient and Reliable Foundational Basis for Expressing Those Expert Opinions Which Are Admissible**

The government's notice fails to establish that Deputy Self has a sufficient basis for those opinions which are admissible.  It merely alleges that he has training, experience, and personal familiarity as a result of his investigations, interview, observations, consultations with others and "familiarity with the instant investigation".  (Ex. A. at 16) This is not, as set forth in the case law described at length in section II above, a

sufficiently detailed disclosure of the bases for his broad set of opinions on matters both general and specific. Without "some proceeding, focused on the reliability of expert testimony, such as a *Daubert* hearing . . . it may be difficult in many cases for the district court to clearly discern an expert's methodology and to evaluate how that methodology connects to the expert's opinions." *United States v. Holguin*, 51 F.4th 841,853 (9th Cir. 2022).

There is no connection made between any specific opinion proffered by the government and his experience. There is no information upon which the defendants can discern the quantum of information and reliability of that information that supports any specific opinion. Based upon this disclosure alone, it is impossible for this Court to perform its gatekeeping function in advance of this trial.

Mr. C. Gonzalez requests that this Court convene an evidentiary hearing before determining that any of Deputy Self's opinions are admissible under Rule 702.


Dated: January 6, 2025                    Respectfully submitted,

                                          /s/ Richard G. Novak
                                          Richard G. Novak
                                          Kenneth M. Miller
                                          **ATTORNEYS FOR DEFENDANT
                                          CARLOS GONZALEZ**

# Exhibit A



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*AUSAs Shawn J. Nelson/Kyle W. Kahan /Kellye Ng/Jason A. Gorn*
*Phone: (213) 894-5339/2238/8408/7962*
*E-mail: shawn.nelson@usdoj.gov*
*kyle.kahan@usdoj.gov*
*kellye.ng@usdoj.gov*
*jason.gorn@usdoj.gov*

*1400/1300 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

December 3, 2024

**VIA E-MAIL**

Marri B. Derby
Law Offices of Marri Derby
23 Corporate Plaza Drive, Suite 150
Newport Beach, CA 92660

Joel M. Furman
Law Offices of Joel M. Furman
1432 Edinger Avenue, Suite 240
Tustin, CA 92780
949-887-2397

Charles Peter Diamond
Law Offices of Charles P. Diamond
1999 Avenue of the Stars Suite 800
Los Angeles, CA 90067-6035

Richard P Lasting
Richard P Lasting Law Offices
315 East 8th Street, Suite 801
Los Angeles, CA 90014

Kenneth M. Miller
Law Office of Kenneth M. Miller
26944 Camino de Estrella, Suite B
Capistrano Beach, CA 92624

Richard G. Novak
Richard G Novak APLC
65 North Raymond Avenue Suite 320
Pasadena, CA 91103

Shaun Khojayan
Shaun Khojayan and Associates PLC
515 South Flower Street, 19th Floor
Los Angeles, CA 90071

Daniel A Nardoni
Law Office of Daniel A Nardoni
215 North Marengo Avenue Suite 328
Pasadena, CA 91101

Re:  United States v. Michael Lerma, *et al.*
No. 2:18-CR-00172(A)-GW
Government's Expert Disclosure re: LASD Deputy Devon Self

Dear Counsel:

This letter constitutes the government's disclosure of its intent to call Los Angeles County Sheriff Department ("LASD") Deputy Devon Self in its case-in-chief at trial to provide expert or opinion testimony under Federal Rules of Evidence 702, 703, and/or 705 of the Federal Rules of Evidence. Attached hereto as Exhibit A is Deputy Self's CV. The government reserves the right to offer additional testimony by this expert, and to amend or adjust his opinions and

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 2

bases for his opinions, based on information received or made known to the expert before or during trial. Pursuant to Rule 16(b)(1)(C), the government hereby requests reciprocal disclosure from the defense of any testimony defendant intends to use at trial under the same Rules of Evidence.

The government expects to call LASD Deputy Devon Self as an expert on the Mexican Mafia, specifically, the history, structure, organization, methods, purpose, and activities of the Mexican Mafia, also known as the EME, in general, the Michael Lerma Cell of the Mexican Mafia more specifically, and drug trafficking and taxation by the Mexican Mafia, generally, and the Michael Lerma Cell, more specifically, as further set forth below.

## I.   **Complete Statement of Opinions**[1]

### A.   **The Mexican Mafia Generally**

####     1.   Formation of the Mexican Mafia

The Mexican Mafia is a prison gang that functions as a "gang of gangs" and is comprised mostly of senior members of southern California Hispanic street gangs who have come together to control and profit from the activities of the Hispanic gangs operating in southern California. The Mexican Mafia engages in a variety of criminal activities, including drug trafficking, extortion, robbery, kidnapping, assault, witness intimidation, money laundering, identity theft, and murder.

The Mexican Mafia was established in the 1950's by Hispanic youth inmates at the Duell Vocational Facility, but over the decades has morphed into an international criminal organization. Today, there are approximately 140 to 150 full members of the Mexican Mafia, commonly referred to as "carnales" or "brothers." The majority of Mexican Mafia members are incarcerated in California prisons or jails, or in federal prisons. By exercising control over inmates in prison and jail systems, primarily through violence and threats of violence, the Mexican Mafia is able to control the activities of southern California Hispanic criminal street gangs, both inside and outside custody facilities.

Mexican Mafia members and associates wield such power over prison and jail populations that they are able to order that acts of violence be carried out not only against other

---

[1] As the Application Notes to the 2022 Amendments to Rule 16 make clear, the Amendment "requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial." Thus, the opinions set forth in this letter are not intended to be a verbatim recitation of the witness's anticipated trial testimony.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 3

prison or jail inmates, but also against street gang members and others (including family members of inmates and gang members) outside of prison or jail.

### 2.   Structure of the Mexican Mafia and Control of Custody Facilities and Neighborhoods

The Mexican Mafia is split into two major subgroups, "State" and "Federal." A state Mexican Mafia member can control state prisons, southern California jails, and southern California neighborhoods, but generally not federal facilities. A Federal Mexican Mafia member can control federal facilities anywhere in the country, and southern California neighborhoods, but usually does not control a state prison or county jail. An example of an exception to this practice would be housing location. For example, a Federal Mexican Mafia member housed in a state prison or jail, or State Mexican Mafia member housed in a federal prison or jail, would attempt to exercise control of the facility in which he was housed. Apart from this divide of what facilities they control, State and Federal Mexican Mafia members generally operate in essentially the same manner and under the same rules.

To become a Mexican Mafia member, a Hispanic gang member generally must have a distinguished reputation for "putting in work" on behalf of the Mexican Mafia, meaning the gang member has murdered and/or assaulted enemies and rivals of the Mexican Mafia, carried out orders that benefited the Mexican Mafia, made money for the Mexican Mafia, or committed criminal acts that benefited the Mexican Mafia. Prospective members are also expected to have provided financial assistance to Mexican Mafia members, and to have followed the Mexican Mafia rules that govern the streets or correctional institutions.

In order to become a made member of the Mexican Mafia, a prospect generally must be sponsored by a Mexican Mafia member, who is commonly referred to as a "padrino." A sponsor or "padrino" will typically seek consensus from other Mexican Mafia members in order to obtain entry into the membership for their prospect. Conversely, in order to remove a Mexican Mafia member from the membership, or to put him in bad standing, a member or group of members would need to obtain a rough consensus of members of the Mexican Mafia, or else a member could face backlash and the loss of power for themselves. Similarly, placing a Mexican Mafia member on the "green-light list" is a major decision that would require a rough consensus of members. It is a general rule in the Mexican Mafia that only a member can murder another member.[2] Occasionally, a prospect may be voted into the membership of the Mexican Mafia in order to carry out the murder of another member.

Mexican Mafia members carry out their criminal activity with the help of associates. Some of these trusted associates act as "shot-callers," that is, high-level associates who have

---

[2] Depending on the circumstance, Mexican Mafia members may change the rules as it suits them.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 4

been given the authority to conduct affairs of the Mexican Mafia, such as collecting extortion
and drug money and enforcing discipline in their particular areas of control.

A "facilitator" is the highest-level shot-caller and works directly under the authority of
the Mexican Mafia member who appointed him. The facilitator coordinates the activities of the
other shot-callers and is responsible for ensuring that other shot-callers carry out the Mexican
Mafia member's orders in their area of responsibility, whether in a neighborhood or a custody
facility. A facilitator is also responsible for appointing and/or removing other shot-callers,
collecting extortion and drug proceeds, and ensuring that Mexican Mafia rules are enforced.

A "secretary" is an assistant to a shot-caller or facilitator. A secretary is commonly a
wife, sister, girlfriend, mother, or family member of the shot-caller or facilitator.[3] This is a
benefit to the shot-caller or facilitator because the individual is trusted, and because it is difficult
for law enforcement to differentiate between personal conversation and Mexican Mafia-related
business. Typically, but not always, a secretary will have little to no criminal history which
allows for the ability to have in-person visits. The majority of correctional institutions have rules
that do not allow for, or severely restrict, in-person visits of individuals with felony convictions
in their criminal history. Additionally, the lack of a criminal history generally means the
individual is not known to law enforcement, and not being actively investigated for criminal
activity.

The main duties of a secretary are to assist the shot-callers/facilitators in maintaining
contact with subordinates and higher-ranking Mexican Mafia associates, the passing of Mexican
Mafia orders, collections of Mexican Mafia proceeds, transfer of the collected proceeds, assisting
and/or organization of drug smuggling into the custodial facilities, and keeping track of debts
owed to the Mexican Mafia.

A "Señora" is a powerful and high-ranking secretary that works directly under the
authority of a Mexican Mafia member. A Señora has the ability to speak on behalf of a Mexican
Mafia member, meaning that an order given by a Señora is essentially an order given by a
Mexican Mafia member himself. It is common for a Señora to be the wife of a Mexican Mafia
member. Señoras are commonly entrusted with the most sensitive workings of a Mexican Mafia
member's illegal activity, including the collection and accounting of proceeds, passing of orders,
and conducting business on behalf of the Mexican Mafia member.

Members of Hispanic street gangs in southern California are referred to as "Sureños" or
"Southsiders" and fall under the control of the Mexican Mafia. Additionally, the Mexican Mafia
considers Mexican nationals, referred to as "Paisas," and Hispanic-American citizens who are
not members of a gang, generally referred to as "Residents," to fall under the Mexican Mafia's

---

[3] Recently, the fact of a familial or similar relationship between a shot-caller and their
secretary has become less common.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 5

control while in a custody facility, and trusted Residents and Paisas may participate in or even be
given shot-caller positions in Mexican Mafia affairs.  Sureno's are generally more "down" for
the cause than Southsiders and more readily volunteer for Mexican Mafia assignments and are
sometimes referred to as "Soldiers."

Members and associates of street gangs controlled by and/or affiliated with the Mexican
Mafia must pay "taxes" to members and associates of the Mexican Mafia for permission to
maintain control over their territories in order to distribute drugs and engage in other criminal
activity. This system of "taxation" amounts to widespread extortion. These "taxes" also ensure
the protection of the gang's members once they enter prisons or jails (protection from other
races, rivals, and the Mexican Mafia itself). The "taxing" and control applies to activities both in
and out of jail or prison. A jail or prison, or a floor, yard, or other unit of a jail or prison is
considered by the Mexican Mafia to be territory just as much as a neighborhood.

Sureños, whether in a custody facility or in a neighborhood, operate as soldiers or
workers for the Mexican Mafia. Being loyal to the Mexican Mafia is an integral part of being a
southern California Hispanic street gang member, and it is openly understood that when
individuals join such gangs that they are joining an entity loyal to the Mexican Mafia. Members
of such gangs are expected to, and are proud to, carry out the orders of the Mexican Mafia
members in control of their neighborhood or custody facility, because doing work for the
Mexican Mafia increases the gang member's status and reputation.

Members of the Mexican Mafia have divided control of, and the rights to criminal
proceeds from, nearly all penal facilities in California, including state prison and county jail
systems and federal prisons. Similarly, members of the Mexican Mafia have divided the rights to
criminal proceeds from the activities of southern California Hispanic criminal street gangs in
various southern California neighborhoods.

Generally, one member of the Mexican Mafia has control of and rights to a specific
facility, or parts of that facility. That member, whether incarcerated in that facility or not, will
control the smuggling of drugs into the facility, drug trafficking in the facility, the collection of
taxes from the sale of those drugs, extortion within that facility (including the kitty and other
fines), gambling, other criminal activity, and the maintenance of discipline within the facility.[4] In
some cases, different members of the Mexican Mafia may control different parts of the same
facility.

Similarly, members of the Mexican Mafia have divided control of and the rights to
"taxes," or a share of criminal proceeds from criminal activities including drug trafficking, from

---

[4] This list of the types of activities the Mexican Mafia conducts is not exhaustive.  Rather,
if the Mexican Mafia identifies a "hustle" from which it can profit, it will demand a cut.  In other
words, Mexican Mafia members are opportunistic—they will seize opportunities to make money
where they find them.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 6

nearly all Hispanic gangs in southern California. Generally, one Mexican Mafia member has control of and rights to a specific area; that Mexican Mafia member will control the sale of drugs within that area, the collection of taxes from that area, and the maintenance of discipline over gang members from that area.

The division of control of custody facilities and neighborhoods is generally agreed upon by the members of the Mexican Mafia, although there are occasionally disputes among members as to the division. Once a Mexican Mafia member acquires control of a custody facility or neighborhood, he can generally operate that custody facility or neighborhood without interference from other members. Interference by a Mexican Mafia member in a territory controlled by a different Mexican Mafia member will generally be met with violent results. The Mexican Mafia member in control of a custody facility or neighborhood will put together a team of trusted associates to control the custody facility or neighborhood.

There are differences between street gangs and the Mexican Mafia, including that individuals from street gangs, particularly smaller gangs, typically know each other, whereas Mexican Mafia associates come from different gangs, so they usually only know a voice over the phone or a name or reputation. When members from different gangs work together, that is a hallmark sign that it involves the Mexican Mafia.

3.    Mexican Mafia Rules and Discipline

The Mexican Mafia has self-imposed rules that are implemented. These rules, often referred to as "reglas," are imposed to maintain fear and compliance among Sureños and Hispanic inmates falling under the Mexican Mafia. Because these rules provide a basis for being fined as well as assaulted, they are a key part of the Mexican Mafia's extortion scheme. Disobeying a Mexican Mafia member is a violation of Mexican Mafia rules, for which discipline may be imposed. Sureño gang members can get into "bad standing," including by owing drug debts, losing narcotics, committing unauthorized acts of violence, or committing other violations of Mexican Mafia rules.

If a southern California Hispanic gang member, or inmate falling under the Mexican Mafia, should break one of these rules, discipline is imposed by a facilitator, shot-caller, or secretary of the Mexican Mafia member in control of the facility. Such discipline is frequently imposed in the form of a fine or an assault.

One of the most important rules for which discipline may be imposed by the Mexican Mafia is a prohibition on cooperating with law enforcement. The punishment for cooperating with law enforcement is placement on the "green light list," meaning marked for death. For this reason, victims to the Mexican Mafia's criminal activities often are unwilling to cooperate with law enforcement, including testifying in court, about the crimes committed against them.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 7

Another important rule of the Mexican Mafia that is enforced is that any inmate who is in
custody for a sex offense is to be assaulted on sight. After the sex offender is assaulted, the
Mexican Mafia then extorts payment from the sex offender in exchange for the Mexican Mafia's
agreement that there will be no further assaults.

The most serious form of discipline is being put on the "green light list" or being
"greenlighted." This is also sometimes known as a "hard candy" order. Being placed on the
green light list means the individual is targeted for death. Only true/full members of the Mexican
Mafia can put a person, group, or entire gang on the green light list. It is possible for those who
are put on the green light list to be removed by the payment of a hefty fine.

4.    Symbols Used by the Mexican Mafia and Mexican Mafia-Affiliated Street
Gangs

The Mexican Mafia and Sureños utilize several symbols to identify themselves with, and
to show allegiance to the Mexican Mafia organization. These symbols are commonly displayed
as tattoos on Mexican Mafia members and associates, as graffiti in areas controlled by the
Mexican Mafia, and in their writing (for example, in kites).

The letter 'M' holds a special meaning with the Mexican Mafia. In Spanish, the letter 'M'
is pronounced "eme." The Mexican Mafia is commonly referred to as "La Eme." Only a full
Mexican Mafia member can have "eme," or variations thereof, tattooed on him. Another symbol
considered to be iconic by the Mexican Mafia is the black hand. Similar to "eme," only a full
Mexican Mafia member can have the black hand tattoo. A non-Mexican Mafia member with
"eme" or the black hand tattoo would be seen as disrespecting the Mexican Mafia and would
face the most severe consequence of being placed on the green light list. However, there is no
rule that members must have such a tattoo symbol, and some members opt not to have such
tattoos in order to not advertise their membership to law enforcement.

'M' is the thirteenth letter in the alphabet, and the number '13' carries significant
meaning for the Mexican Mafia. Many Hispanic gangs will include the number 13 in their name
to show allegiance to the Mexican Mafia. For example, Mara Salvatrucha 13 (MS-13), Florencia
13, and Puente 13.

Common symbols utilized by Sureños and Mexican Mafia associates are the "kanpol,"
Aztec "G-Shield," and "Sur." The kanpol is described as three dots over two horizontal lines. In
the Aztec symbology, each line represents '5' and each dot represents a '1,' meaning that the
symbol represents the number 13. Further, in the Nahuatl language, "kanpol" means "southerner
(or Sureños)."

Southern California Hispanic street gangs often develop their own symbols, logos, or
unique markers and will display those symbols as tattoos on their bodies in order to identify the
members of their gang.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 8

> 5.    Mexican Mafia Drug Sales within State Prisons, County Jail Systems,
>       Federal Detention Facilities and on the Streets.

The Mexican Mafia makes money by controlling the sales of drugs. On the streets, profiting from drug trafficking takes the form of "taxing" drug dealers. All Hispanic drug dealers in areas controlled by the Mexican Mafia must pay a percentage of their profits from the sales of drugs. If the drug dealer does not pay, he/she will not be allowed to sell drugs in that area, under the threat of assault or even death. If the drug dealer does pay the tax, the drug dealer benefits by receiving protection from other dealers or robbers and gains assistance in collecting debts.

Inside of a state prison, county jail system, or federal detention facility, the taxing of drug trafficking takes two forms. First, a Mexican Mafia member, shot-callers, and associates will arrange for drugs to be smuggled to them inside of a custodial facility. Drugs belonging to a Mexican Mafia member directly are known as "hot dope." Once the Mexican Mafia member or his trusted shot-caller or facilitator within the custodial facility receives the drugs, he will direct their sale within the custodial facility with the proceeds benefiting the member in control of that facility. Furthermore, others within the facility will not be allowed to sell their own drugs until the Mexican Mafia member's drugs have been sold. This is known as "shutting down the corner."

Other Hispanic inmates that smuggle drugs into the custodial facility are subject to taxation on their drugs. This is known as the "thirds" tax. Pursuant to this thirds tax, one third of each shipment of drugs that is smuggled into the custodial facility must be "broken-off" and given to the Mexican Mafia member in control of the facility or his trusted shot-caller or facilitator.[5] If the Mexican Mafia member decides to sell the "thirds-tax" portion of the drugs, they are sent to a dorm/floor/pod/module for sale with the proceeds going to the Mexican Mafia member, and others in that housing area are not allowed to sell drugs until the Mexican Mafia member's thirds have been sold.

The Mexican Mafia does not limit its extortion to the sale of drugs and the operation of the kitty in the custodial facility. The Mexican Mafia may subject any person or inmate in the a custodial facility or Mexican Mafia-controlled neighborhood to extortion for any money-generating activity he/she engages in while in the controlled territory.

**B.    The Michael Lerma Cell of the Mexican Mafia and the Charged Conduct more Specifically.**

Deputy Self will explain how the Mexican Mafia's and Michael Lerma Cell Enterprise's structure applies within cities in California such as Pomona, and custodial facilities, including

---

[5] Recently, this has been as high as fifty percent.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 9

the Metropolitan Detention Center in Los Angeles ("MDC") and the Calipatria State Prison in
Imperial County, California.

　　　　1.　　Formation of the Michael Lerma Cell of the Mexican Mafia

Michael Lerma is a Mexican Mafia member who started out as a member of the Pomona
12th street gang. After going to prison, he worked his way up to Mexican Mafia membership
sometime around the early 1990s. Because of his historic ties to Pomona Lerma controlled the
criminal activities in and around Pomona.

Lerma had been using Viviano Perez as his facilitator in Pomona. Upon Viviano's death,
his wife, Cheryl Perez-Castaneda took over as Lerma's Senora, or top shot-caller on the streets in
and around Pomona and she was in this role during the events charged in the indictment.

Viviano Perez had been a Cherryville gang member. Cheryl Perez was also Cherryville
gang member. Even though Mike Lerma was from Pomona 12th Street, it is common for
members to work with trusted associates even if they are from rival gangs like Vivano and
Cheryl. This is particularly true when the Mexican Mafia member is from that area. Cheryl
Perez-Castaneda would then be responsible for assembling a team or soldiers and enforcers to
take care of business on the streets, including Seferino Gonzalez, Carlos Gonzalez, Jose
Gonzalez, and Juan Sanchez.

Mike Lerma also controlled parts of prisons, including a portion of Calipatria State
Prison. Members gain control of portions of prisons by using trusted and influential Surenos to
take control of a portion of the prison. Members will vie for control of yards and the control of
yards is jealously guarded. The Surenos in control of a portion of the facility on behalf of
members use out-of-custody secretaries to communicate and collect money from the criminal
activities in those prisons. The phone calls in the discovery related to Calipatria are evidence of
this in that they a shot-caller in Calipatria talking to Lerma's Senora (or high ranking secretary)
about enterprise activities in and proceeds from Calipatria.

　　　　2.　　Means and Methods of the Michael Lerma Cell of the Mexican Mafia

The First Superseding Indictment sets forth the means and methods of the Michael Lerma
Cell of the Mexican Mafia, which includes (1) "[e]ngaging in drug trafficking in and around the
City of Pomona, in Calipatria State Prison, and in MDC-LA, as a means to generate income";
(2) "[e]ngaging in extortion as a means to generate income"; (3) "[w]orking together to collect a
portion of the proceeds of drug trafficking conducted by street gang members and others in and
around the City of Pomona, in portions of Calipatria State Prison, and in MDC-LA"; and
(4) "[w]orking together to commit robbery."  (First Superseding Indictment at 10(a)-(d).) The
Michael Lerma Cell of the Mexican Mafia also "[p]romot[es] a climate of fear, particularly
among rival gang members, potential witnesses to the gang's criminal conduct, and Hispanic
gang members, paisas, residents, or others who may cooperate with law enforcement, through

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 10

acts of violence and threats to commit acts of violence." (Id. at 10(g).)  The First Superseding
Indictment sets forth the purposes of the Michael Lerma Cell of the Mexican Mafia, which
includes (1) "[e]nriching members and associates of the Michael Lerma Cell of the Mexican
Mafia through, among other things, the control of and participation in the distribution of
controlled substances in and around the City of Pomona, and extortion of others engaged in the
distribution of controlled substances and other crimes in and around the City of Pomona, in
portions of Calipatria State Prison, and in MDC-LA"; and (2) "[e]nriching members by engaging
in and taxing other illegal activities . . . in and around the City of Pomona." (Id. at 9(a)-(b).)
Drug trafficking and extortion are central to the Mexican Mafia's organization, though its
activities can expand beyond drug trafficking an extortion and into other arenas in which the
Mexican Mafia can take a cut.  In other words, the Mexican Mafia members are opportunistic
and will seek a variety of opportunities and means to extort others.

### 3.    Overall Structure of the Michael Lerma Cell

Michael Lerma was at the top of the enterprise. During period including 2012 through
2016 Cheryl Perez Castaneda was Lerma's Senora or highest-ranking associate on the streets in
and around Pomona. In this role Cheryl Perez-Castaneda operated with Lerma's authority and
authorized criminal activities and authorize and enforced the taxation of criminal activities in and
around Pomona. Also during that time, Cheryl Perez Castaneda was assisted by influential
enforcers including Seferino Gonzalez, Carlos Gonzalez, Juan Gonzalez, Jose Martinez, and
Juan Sanchez.

Once Lerma, Carlos Gonzalez, Juan Sanchez, and Jose Gonzalez all got to custody
together, Lerma was able to directly control their activities without having to go through a
Senora or secretary. As the Mexican Mafia member on 6-North of MDC, he was able to directly
control the activities of Hispanic gang members there and set up a trusted team of soldiers and
associates, which somewhat naturally included Pomona gang members such as Carlos Gonzalez,
Juan Sanchez and Jose Gonzales, who had already been committing crimes on behalf of the
enterprise.

This was all consistent with general Mexican Mafia practices as set forth in Section I-A-
2, above.

### 4.    Control of Activities in Pomona

Pomona is a city in eastern Los Angeles County that is home to a number of
predominantly Hispanic street gangs loyal to the Mexican Mafia. A member of the Mexican
Mafia may exercise control over the activities, including illegal ones, conducted by the
predominantly Hispanic street gangs within and around Pomona. Alternatively, these activities
may be divided and controlled by different members of the Mexican Mafia. The Michael Lerma
Cell Enterprise claimed control of and, in fact, controlled Pomona and the surrounding areas as

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 11

well as profits derived from illegal activities performed by members of the predominantly
Hispanic street gangs, including drug distribution and extortion.

The activities in the indictment, including, the taxing of "the Compound", the taxing of
the identity theft ring, the kidnapping and theft from C.V., and the attempted taking of the car
and other property from E.N. and M.A. are prototypical Mexican Mafia enterprise activities.

5.   Control of Activities in Calipatria

Calipatria State Prison is a California facility controlled by the California Department of
Corrections and Rehabilitation and has been divided amongst members of the Mexican Mafia,
including the Michael Lerma Cell Enterprise. As such, the Michael Lerma Cell Enterprise has
claimed control of profits derived from illegal activities conducted inside the facility, including
drug distribution and extortion. California prisons, including Calipatria State Prison, operate
inmate trust accounts for their inmates. The Mexican Mafia, including the Michael Lerma Cell
Enterprise, take advantage of this by using the inmate trust accounts to deposit proceeds derived
from illegal activities, including drug distribution and extortion, performed by Mexican Mafia
members and associates outside of and within the prison.

The phone calls and text messages to and from Calipatria in the discovery are consistent
with a shot caller in Calipatria reporting to Cheryl Perez Castaneda about the enterprise's
activities there and remitting proceeds to Cheryl. It was these or similar proceeds that were
placed on Lerma's prison account because the enterprise exists to make money for its members
and associates and associates would not need to put their own money on Lerma's books while he
was making money as an EME brother.

6.   Control of Activities at MDC

Deputy Self will explain how Lerma was entitled to take over 6 North or 6N as the EME
member housed there upon his arrival, in a manner consistent with what is described in
paragraph I(A)(2). As the head of 6N and the Michael Lerma Cell Enterprise, Lerma was
entitled to control all of the crime that took place within the block and to profit from it through
taxation and extortion. This includes drug sales, gambling, and debt management. To control
others through fear and extortion, the Michael Lerma Cell Enterprise would monitor and enforce
debts owed to the enterprise, including those owed by inmates for purchasing drugs inside MDC.
To enforce the debts, other members of the Michael Lerma Cell Enterprise would volunteer to
assist the enterprise in furthering its objectives, namely, to make money and instill a culture of
fear and obedience within the facility. After volunteering, a head of the enterprise, i.e., Lerma,
would select those who could enforce the enterprise's debt management.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 12

7.    Collaborative relationship with LACJ Enterprise.

Even where the Michael Lerma Cell of the Mexican Mafia does not control a facility or neighborhood, members of the enterprise can work with the Mexican Mafia enterprise that does control the facility or neighborhood to advance the goals of the Michael Lerma cell of the Mexican Mafia. Particularly related to this case, this occurred in the Los Angeles County jail system (LACJ).

LACJ is operated by the Los Angeles County Sheriff's Department. The system includes various men's facilities including Men's Central Jail, the Twin Towers Correctional Facility, the Inmate Reception Center, the North County Correctional Facility, Pitchess Detention Center-North Facility, Pitchess Detention Center-East Facility, and Pitchess Detention Center-South Facility. On any given day, the system houses approximately 15,000 inmates.

At any time, one Mexican Mafia member may exercise control over the entire system, or control of various facilities within the system may be divided among different members of the Mexican Mafia. The Mexican Mafia member in charge of a LACJ custody facility maintains control over the facility with the assistance of trusted shot-callers, facilitators, and associates. These Mexican Mafia members and associates, working together to control criminal activity within LACJ, have become their own entity or enterprise and effectively function as an illegal government within LACJ custody facilities. During the time period of the conduct in the first superseding indictment regarding the extortion of a Mercedes automobile by Seferino Gonzalez and other enterprise members, LACJ was controlled by Jose Landa-Rodriguez, also known as "Fox."

As a shot caller for the Mexican Mafia's Michael Lerma Cell Enterprise at the LACJ, Seferino Gonzalez was authorized by the enterprise to extort other inmates at LACJ.

Within the LACJ, the Mexican Mafia and its associates communicate with local street gangs and other Mexican Mafia members and associates, both inside and outside of prison and jail, including in the following ways:

•    Recorded phone calls made over the Inmate Telephone Monitoring System ("ITMS"): This is the method provided by the LASD that affords inmates the ability to make outgoing telephone calls, for a fee, from within the LACJ. These calls are all recorded. Before an ITMS call is connected, the inmate is admonished that the call will be recorded and possibly reviewed by law enforcement. The inmate must hit a button to acknowledge the admonishment and consent to the call being completed. The receiver of the call is also admonished that the call will be recorded and possibly reviewed by law enforcement. The receiver must hit a button to acknowledge the admonishment and consent to the call being completed. These pre-recorded admonishments periodically repeat during the call.

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 13

- Kites: Also known as a "wila" or "1x," a kite is a handwritten note on paper used to relay Mexican Mafia-related messages throughout the LACJ. Depending on how far the kite has to travel, and the importance of the information contained in the kite, they are frequently written on very small pieces of scrap paper in very small writing. These small pieces of paper are then frequently secreted into the anal cavity of the courier to avoid being detected and confiscated by law enforcement. Kites can contain sensitive information that is smuggled outside of the LACJ to gang members and Mexican Mafia associates on the streets.

- In-Person Visits: Mexican Mafia-related messages are passed through in-person jail or prison visits. Associates working for the Mexican Mafia will visit shot-callers, and their in-custody assistants, to pass messages and/or orders. These messages are typically more sensitive in nature than what is passed over ITMS because all ITMS calls are recorded and can be reviewed at a later time, whereas visits are not recorded absent a special request. It is not uncommon for kites to be used to pass messages during in-person LACJ visits, by holding messages up to the dividing glass.

- Verbals: A "verbal" message is a Mexican Mafia-related message passed verbally from one individual to another until it reaches its destination. Verbal messages are commonly used to pass more sensitive information as there is little chance of law enforcement overhearing the message and does not leave a trail of physical evidence.

    8.    Symbols, Names, etc. of the Michael Lerma Cell and Its affiliated Street
          Gangs.

Deputy Self will opine that the Cherryville Pomona street gang is a Sureño gang that is loyal to the Mexican Mafia, including the Michael Lerma Cell Enterprise. Cherryville members utilize several symbols to identify themselves with, to show allegiance to the Cherryville organization. These symbols are commonly displayed on Cherryville members and associates, as graffiti in areas controlled by Cherryville, and in their writing (such as kites).

The letter 'P' is utilized by Cherryville members and associates – like other gangs originating in Pomona – due their origin in Pomona. Likewise, Cherryville members and associates, like other gangs associating in Pomona – can also have the word "Pomona" tattooed on them. Another symbol used by Cherryville members and associates is the cherry or a cluster of cherries, or variations of the words "cherry," "cherries," "Cherryville," or "Cherrieville."

    9.    Meaning of Specific Pieces of Coded Language.

The government anticipates that Deputy Self will testify about jail calls made by Seferino Gonzalez to defendant, Jose Valencia Gonzalez, Cheryl Castaneda Perez, Trisha Perez, and Mohammad Alsairwan, and by jail calls made by William McCord to Erica Newell. Deputy Self

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 14

will testify that inmates routinely use coded language in jail calls, because they know the jail calls are being recorded and monitored by law enforcement.

In particular, the government anticipates that Deputy Self will testify to the common use of and meaning of "coded" language within jail calls, recorded calls, and kites by gang members, gang members loyal to the Mexican Mafia, and Mexican Mafia members and associates. Deputy Self will opine that the surrounding context can sometimes provide greater clarity into the coded language behind certain words that, without context or seeing the resulting act, would appear to be ordinary language. This includes, but is not limited to:

- Tweekers = drug users, including methamphetamine and cocaine base

- Smash = assault

- Bills = money

- Busted = arrested or incarcerated

- Quarter = a quantity a of drugs, can be a quarter pound or quarter ounce depending on the context

- Stuff his butt = insert drugs into one's rectum and smuggle inside a custodial facility

- Homies = other gang members or associates

- Super Max = the LACJ North County Correctional Facility

- Ounce = an ounce of a drug

- Hook up = as a noun, it is a source for drugs, as a verb, it means to provide drugs

- Third = a third of profit owed to the Mexican Mafia and the Michael Lerma Cell Enterprise

- Collect Taxes/Tax Them/Tax = the share of a gang member or associate's profit derived from an illegal activity owed to the Mexican Mafia and the Michael Lerma Cell Enterprise

- Nickels = $5 worth of drugs

- Dimes = $10 worth of drugs

- Twenties = $20 worth of drugs

- Poppin/Popping = gunshots

- Bust a cap on his ass = shot someone

- Shot his ass = shot someone

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 15

- Dropped his ass = assault or shot someone
- One fifty for a quarter = $150 for a quarter-ounce of a drug
- Three hundred dollars a half = $300 for a half-ounce of a drug
- Six hundred dollars an ounce = $600 for an ounce of a drug
- Snitch = someone who cooperates with law enforcement and reveal criminal associates or criminal activity, or to do so
- Rat = Tell law enforcement about or give up to law enforcement or cooperate with law enforcement
- King of Pomona = leader of the city of Pomona through gang and criminal activity
- Balance = debt owed to the Mexican Mafia
- Comarada = A influential Sureno gang member loyal to the Mexican Mafia
- Homeboy = a (usually gang-related) friend
- Cherryville = a Pomona-based gang loyal to the Mexican Mafia and the Michael Lerma Cell Enterprise
- Popeye = Carlos Gonzalez
- Swifty = Jose Valencia Gonzalez
- South side = the southern territory of Pomona
- Sell = sell drugs on behalf of a gang
- Paying or Pay Up = contributing to taxes owed to the Mexican Mafia
- Black = heroin
- Business = drug sales
- Supply you guys = supply dealers with drugs
- 12 Street = A Pomona-based street gang loyal to the Mexican Mafia and the Michael Lerma Cell Enterprise
- Three = $300
- Dope = drugs
- Crystal = methamphetamine
- Eight ball = 1/8 of an ounce of drugs
- Spooky = Seferino Gonzalez

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 16

- 22 bullets = .22 caliber ammunition
- Short = below the expected payment, including for taxes owed to the Mexican
  Mafia

The government further anticipates that Deputy Self will testify to the common use of
and meaning of "coded" language within jail calls and kites regarding jails, and prisons,
including, but not limited to, "kites," "books," "money for my books," "money pack," "green
dot," "put money on the phone," and "go away for a long time," "that shit is gonna be coming in
here," "yard," "the hole," and "kitty."

### C.   Knowledge Regarding Mexican Mafia's and Michael Lerma Cell Enterprise's Racketeering Activities

Deputy Self will opine as to particular mental states of people in certain roles in the
Mexican Mafia. Specifically, he will opine that most members and associates of the Mexican
Mafia know that the Mexican Mafia uses violence to achieve its goals, including disputes over
territory and power. See Diaz v. United States, 144 S. Ct. 1727 (2024). This violence includes
murders, attempted murders, assaults, stabbings, extortion, robberies, kidnappings, and other
violent acts that occur both inside and outside of custody facilities. In addition, most people who
pass messages for the Mexican Mafia do so intending to further the criminal business of the
Mexican Mafia. This is because information from Eme members is closely held and highly
valuable, so members would not give the information to someone whom they do not trust;
moreover, maintaining secrecy is important to avoid detection from law enforcement and to
prevent rivals from learning of criminal plots; thus, members would not give the information to
someone who could lose it, or who could cooperate against them.

## II.   Bases and Reasons for Opinions

The reasons and bases for Deputy Self's opinions is his individual training and
experience, as well as his personal familiarity with facts and evidence demonstrating the criminal
activity of the Mexican Mafia and associates, including through various personal investigations
he has conducted, interviews with defendants and informants, personal observance of
audio/video recorded evidence, review of seized evidence, consultation with other gang experts,
familiarity with the instant investigation, and observance of and participation in numerous court
proceedings involving Mexican Mafia members and associates.

## III.   Witness's Qualifications

Deputy Self's qualifications are described in his curriculum vitae, attached hereto as
Exhibit A. Deputy Self's testimony is based on his experience in law enforcement and over 10
years of experience working directly on, or collaborating with other law enforcement officers
and agents on, Mexican Mafia and Hispanic gang cases. Deputy Self has been a Deputy Sheriff
with the Los Angeles County Sheriff's Department for over 10 years, during which he has

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 17

worked in Men's Central Jail, where he investigated, interviewed, and documented incidents
occurring in the jail, and investigated Mexican Mafia-related crimes and other gang activity both
inside and outside the jail facility. Deputy Self has also served as a patrol officer and in the
Prison Gang Unit of the Major Crimes Bureau.

        For over five years, Deputy Self has been a Task Force Officer on the FBI's San Gabriel
Valley Safe Streets Task Force ("SGVSSTF"), where he has conducted dozens of investigations
relating to Hispanic gangs and the Mexicana Mafia regarding homicides, assaults, kidnappings,
witness intimidation/retaliation, robberies, weapons violations, narcotics trafficking, thefts, and
other similar criminal activity. During his tenure on the SGVSSTF, Deputy Self has been
involved of hundreds of interviews with victims, witnesses, cooperators, and suspects, including
with Mexican Mafia members and Mexican Mafia associates. He has authored and executed
hundreds of search warrants relating to Hispanic gangs and the Mexican Mafia, and he has
listened to thousands of hours of recorded conversations between and among Hispanic gang
members and Mexican Mafia members and associates.

        Deputy Self received more than 700 hours of training on a wide variety of police
procedures, including gang and narcotics investigations, weapons, and other topics. He also
received 40 hours of certified training on criminal gang activity and investigations; 16 hours on
search warrant and informant management training; over 15 hours in the identification and
documentation of gang members both in custody and on the streets; and over 50 hours of training
on prison and street gangs. Deputy Self has also trained other law enforcement personnel on the
Mexican Mafia both inside and outside of the Los Angeles County Jail.

        Deputy Self has testified in an expert on the Mexican Mafia in nearly 10 trials, in both
federal and state court, during which he testified regarding the use and meaning of coded
language, the Mexican Mafia criminal enterprise, and the Mexican Mafia's organization in the
Los Angeles County Jail.

## IV.    List of Prior Expert Testimony

        Deputy Self has testified as an expert in the following cases, as identified by their case
numbers:

| Case Number | Case Name | Topic |
|---|---|---|
| TA143615 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |
| TA143616 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |
| TA143617 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |
| TA143623 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |
| TA143623 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 18

| TA146714 | People v. Soto, *et al.* | Mexican Mafia |
|---|---|---|
| 18-CR-00173 | United States v. Zendejas Chavez | Mexican Mafia |
| 18-CR-00173 | United States v. Diaz | Mexican Mafia |
| 18-CR-00172(A) | United States v. Deshannon | Mexican Mafia |
| 18-CR-00172(A) | United States v. Deshannon | Mexican Mafia |
| 24SFCF00364 | People v. Grajales | Mexican Mafia |
| TA143623 | People v. Rivera, *et al.* | Mexican Mafia/Coded Language |

**V.      Publications**

Deputy Self has not authored any publications.

**VI.      Signature**

Consistent with Rule 16(a)(1)(G)(v), Deputy Self's signature below signifies that he has reviewed the above disclosure and approves of its contents.

DEVON SELF
Deputy Sheriff, Los Angeles County Sheriff's Department
Task Force Officer, San Gabriel Valley Safe Streets Task Force

*        *        *

Please let me know if you have any questions or would like to further discuss any of the matters raised above. The government believes that the information contained in this notice is sufficient to meet the obligations of Rule 16. If you feel otherwise, please advise immediately. Please note that the government's expert notice requirements under Rule 16 apply only to its case-in-chief. As soon as the government is apprised of any defense that you wish to advance at trial, I will advise you of the government's intent to call any rebuttal experts. The government also hereby requests, pursuant to Rule 16(b)(1)(C), a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence,

Shawn J. Nelson/Kyle W. Kahan/Kellye Ng/Jason A. Gorn
RE: *United States v. Lerma, et al.*, 18-CR-00172(A)-GW.
Government's Expert Disclosure – LASD Deputy Devon Self
December 3, 2024
Page 19

including the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Sincerely,

SHAWN J. NELSON
KYLE W. KAHAN
KELLYE NG
JASON A. GORN
Assistant United States Attorneys
International Narcotics, Money
 Laundering, and Racketeering, and
Violent and Organized Crimes Sections

Enclosures

LS_012259

**Devon P. Self**
Deputy Sheriff, Los Angeles County Sheriff's Department
11515 Colima Road, Whittier, California 90604


**TRAINING**

Los Angeles County Sheriff's Department- Deputy Sheriff Trainee (2012), Academy Class
391
>Received more than 700 hours of training of a wide variety of police procedures, including patrol
>operations, narcotics investigations, gang investigations, sex crimes, weapon laws, and criminal
>behavior.

Street Gangs and Sub-Cultures (2015)
>Received 40 hours of P.O.S.T. certified training and criminal gang activity and investigations.

Search Warrant and Informant Management (2015)
>Received 16 hours of P.O.S.T certified search warrant and informant management training

Serrato & Associates, Inc. "Certified Gang Enforcement Officer" (2015)
>Received 16 hours of training course focused on the foundation of the identification and
>documentation of gang members both on the streets and in custodial settings. Instruction on the
>legal foundation to file and prosecute gang members, along with an explanation and
>understanding of PC 186.22(a) gang enhancements.  Investigation aspects of gang contacts,
>gang injunctions, debriefing and gathering intelligence from multiples sources, cultivating
>informants, and PC 186.30 (gang registrations).

California Gang Task Force Gang Training (2014)
>Received 22 hours of training relating to prison and street gangs along with current gang trends

California Gang Task Force Gang Training (2016)
>Received 27 hours of training relating to prison and street gangs along with current gang trends

Mexican Mafia, Prison Gang Training (2016-2017)
>Provided training to Los Angeles County Sheriff Deputies on Mexican Mafia related activity in and
>outside of the Los Angeles County Jail.


**EXPERIENCE**

Los Angeles County Sheriff's Department, Men's Central Jail (2013-2014)
>Provide security for inmates housed on Men's Central Jail, as well Investigate, interview and
>document incidents occurring in the jail facility.

Operation Safe Jail (Men's Central Jail) (2014-2016)
>Investigate Mexican Mafia related crimes, as well as other gangs operating both inside and
outside the jail facility.  Assisted various agencies with gang and narcotics related activities.  Identify and
document gang members.  Interview gang members, as well as debrief gang members who are dropping
out of a gang.

Central American Law Enforcement Exchange Program (2015)
>Provided training on Mexican Mafia related activity to members of various law enforcement
agencies throughout Central America, as well as The Federal Bureau of Investigations.

San Gabriel Valley Safe Streets Task Force (2016 – 2018)
>Conducted criminal investigations throughout Los Angeles County.  I conducted specific
>investigations related to Hispanic gangs and the Mexican Mafia.  Specifically focusing on crimes
>related to the Los Angeles County Jails.  Assisted other law enforcement agencies with various
>types of criminal investigations.  Conducted interviews of victims, witnesses, and suspects.
>Contacted and interviewed Mexican Mafia members.  Authored and executed search warrants

related to gang related crimes and crimes specifically influenced by the Mexican Mafia.
Completed reports and presented criminal filings to the Los Angeles County District Attorney's
Office.

## Compton Sheriff's Station, Patrol (2018-2021)

Completed field training and patrolled the City of Compton and unincorporated areas policed by
the Compton Sheriff's Station. Investigated and documented a wide variety of crimes ranging
from infractions to serious violent felonies

## Major Crimes Bureau (Prison Gang Unit) and San Gabriel Valley Safe Streets Task Force
## (2021 – present)

Conducted criminal investigations throughout Los Angeles County.  I conducted specific
investigations related to Hispanic gangs and the Mexican Mafia.  Specifically focusing on crimes
related to the Los Angeles County Jails.  Assisted other law enforcement agencies with various
types of criminal investigations.  Conducted interviews of victims, witnesses, and suspects.
Contacted and interviewed Mexican Mafia members.  Authored and executed search warrants
related to gang related crimes and crimes specifically influenced by the Mexican Mafia.
Completed reports and presented criminal filings to the Los Angeles County District Attorney's
Office.

## COURT EXPERIENCE

## State Court (Los Angeles County, California)

Testified in Compton, LAX, Clara Shortridge Foltz Criminal Justice Center (CCB),, and Pomona
Superior Courts.  Obtained, or assisted in obtaining, several arrest warrants and search warrants
relating to various crimes.
Testified as an expert on the Mexican Mafia criminal enterprise and coded language.

## Federal Court (Central District of California)

Testified as an expert on the Mexican Mafia criminal enterprise and coded language.

# Exhibit B

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

AURELIO PATINO, CHRISTOPHER RUIZ, AND JOSE VILLEGAS,

        Defendants.

Case No.: EDCR 18-00250-CJC

**ORDER GRANTING IN PART DEFENDANTS' JOINT MOTION FOR AN ORDER EXCLUDING OR LIMITING EXPERT TESTIMONY [Dkt. 389]**

## I.    INTRODUCTION

Defendants Aurelio Patino, Christopher Ruiz, and Jose Villegas (collectively, "Defendants") are charged with first-degree murder and conspiracy to commit first-degree and second-degree murder for the 2013 death of fellow inmate Javier Sandez at the Federal Correctional Institution, Victorville Medium II prison.  (*See* Dkt. 1

[Indictment].)  The Government alleges that Defendants and Mr. Sandez are members or affiliates of the Sureños gang and that this gang affiliation is relevant to Defendants' motive to murder Mr. Sandez.  (*See* Dkt. 402 [Opposition to Notice of Motion and Motion for Order, hereinafter "Opp."] at 1.)  With trial scheduled to begin on January 10, 2023, the Government has disclosed that it intends to call former Bureau of Prisons Special Investigative Agent John Feeney to testify as a prison gang expert.  (*See id.* at 6, 19–21.)

On October 31, 2022, the Court issued an order granting Defendants' motion for an evidentiary hearing and deferring ruling on whether to exclude or limit Mr. Feeney's testimony until after the hearing.  (*See* Dkt. 404.)  On November 8, 2022, the Court held a hearing to review the admissibility of Mr. Feeney's testimony.  (*See* Dkt. 415 [Minutes of Evidentiary Hearing].)  At the hearing, Mr. Feeney testified regarding his qualifications to provide expert testimony on the Sureños gang as well as the basis and reliability of his opinions.  Afterwards, the parties submitted supplemental briefing.  (*See* Dkt. 431 [Supplemental Memorandum in Opposition to Notice of Motion and Motion for Order, hereinafter "P. Supp."]; Dkt. 436 [Memorandum in Support of Notice of Motion and Motion for Order, hereinafter "D. Supp."].)  Having considered the parties' briefs and the evidence presented at the hearing, the Court now takes up the second half of Defendants' motion—whether to exclude or limit Mr. Feeney's testimony.  (*See* Dkt. 389 [Notice of Motion; Joint Motion of the Defendants for Evidentiary Hearing Concerning the Admissibility of the Government's Proffered Expert Testimony Concerning Prison Gangs, and for Order Excluding or Limiting Such Testimony, hereinafter "Mot."].)  For the following reasons, the Court **GRANTS IN PART** Defendants' motion for an order excluding or limiting Mr. Feeney's testimony.

//

//

//

## II.  BACKGROUND

Mr. Feeney worked at the Federal Bureau of Prisons from 1990 to 2015.  (*See* Dkt. 432-1 [Exhibit 1, Transcript of November 8, 2022 Hearing, hereinafter "Tr."] 9:15, 12:3.) From 1990 to 1998, he worked as a correctional officer and then a lieutenant.  (*Id.* 9:16– 10:4.)  In those roles, he had hundreds of daily contacts with inmates, including members of the Mexican Mafia and the Sureños.[1]  (Tr. 10:5–21.)  From 1998 to 2015, Mr. Feeney worked as a Special Investigative Agent, collecting intelligence on prison gangs.  (*Id.* 11:14–18.)  Mr. Feeney specialized in investigating gangs with high incident rates, such as the Aryan Brotherhood, Mexican Mafia, and Texas Syndicate.  (*See* Dkt. 402 [Opposition to Notice of Motion and Motion for Order, hereinafter "Opp."] at 2–3.)  The purpose of this intelligence collection was "preventative," with the goal of "keep[ing] the staff and inmate population safe."  (Tr. 12:17–18.)

As Mr. Feeney explained during the hearing, when inmates want to leave a gang, they are given paperwork and questionnaires to complete, referred to as "an autobiography."  (*Id.* 14:1–13.)  The average autobiography is twenty-five to thirty handwritten pages in which the inmate chronicles their experience in the gang.  (*See id.* 14:14–24.)  Once that is complete, a Special Investigative Agent conducts an extensive interview with the individual.  (*See id.* 15:22–16:1.)  As a Special Investigative Agent, Mr. Feeney conducted over 200 debriefing interviews with inmate members of the Sureños trying to leave the gang, during which inmate members discussed the details of any assaults or killings they carried out as members of the gang.  (*See id.* 16:2–9.)  Mr. Feeney would attempt to verify the information he recieved by contacting the inmate members' facilities or reviewing their Presentence Investigation Reports.  (*See id.* 16:16– 21.)  In addition to the 200 interviews he personally conducted, Mr. Feeney gained

---

[1]  The Sureños are a primarily Hispanic gang that operates under the umbrella of the Mexican Mafia.  (*See* Opp. Ex. 1 at 4–5.)

further knowledge about the Sureños gang by conferring with his colleagues and agents under his supervision about interviews they conducted.  (*See id.* 17:11–18:2.)  A substantial part of Mr. Feeney's job also involved monitoring gang members' letters, emails, phone calls, visits, and prison accounts.  (*See id.* 33:11–14.)  Finally, he has also given trainings on the Mexican Mafia and the Sureños, spoken at gang conferences, and published a guide for law enforcement on the Sureños.  (*See* Mot. at 19.)

Defendants and Mr. Sandez are alleged to be members or associates of the Sureños prison gang.  (*See* Mot. at 5.)  The Government has put forth Mr. Feeney to testify as a prison gang expert on multiple topics, including the definitions of certain commonly-used terms in gang culture, the structure and rules of the Sureños gang, how the Sureños handle disputes with rival gangs, and how the Sureños discipline their members.  (*See id.* at 19–21.)

Though the parties do not appear to dispute Mr. Feeney's general qualifications to testify as a prison gang expert, Defendants object that his testimony is irrelevant and will vouch for the disputed testimony of lay witnesses.  (*See id.* at 1.)  The Government responds that Mr. Feeney's testimony is admissible and that Defendants' objections are more appropriately dealt with during trial.  (*See* Opp. at 6 ["[T]he issues raised by [D]efendants are, at most, topics for cross-examination during trial."].)

## III.   LEGAL STANDARD

The district court has a "special obligation" to serve as a gatekeeper for expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Testimony is properly characterized as "expert" if it concerns matters that the average juror is not capable of understanding on his or her own.  *See United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert

testimony where . . . the subject matter of the expert's testimony is not beyond the ken of the average juror.").

Federal Rule of Evidence 702 governs the admission of expert testimony.  A witness may be qualified to testify as an expert "due to their knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  When faced with a proffer of expert testimony, the court must determine whether

> (a) scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case.

*Id.* 702(a)–(d).  The proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).

Under Rule 702(b), expert testimony must be "based upon sufficient facts or data."  "The question is whether the expert considered enough information to make the proffered opinion reliable."  29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268 (2d ed.).  To determine the reliability of proffered expert testimony, the district court must "analyze not what the experts say, but what basis they have for saying it."  *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995).  An expert's opinions are not reliable when the expert bases their conclusions on "mere subjective beliefs or unsupported speculation."  *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under

*Daubert* and Rule 702."); *Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 366 (10th Cir. 1993) (excluding expert testimony as "professional speculation").

"Expert opinion testimony . . . is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (cleaned up). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

Expert testimony that is otherwise admissible under Rule 702 may nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *United States v. Winkle*, 477 F3d 407, 417 (6th Cir. 2007) (internal quotes omitted); *see also* Fed. R. Evid. 403 advisory committee's notes to 1972 proposed rules. Rule 403 plays an especially important role when it comes to the admission of expert testimony, as "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1005 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at

595), *amended*, 272 F.3d 1289 (9th Cir.). "A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses . . . ." *Amuso*, 21 F.3d at 1263 (citations omitted).

## IV. DISCUSSION

Defendants seek to exclude Mr. Feeney's testimony on nine topics, which fall into the following five categories: (1) gang structure, rules, and discipline, (2) characteristics of Sureños attackers, (3) attacking without weapons, (4) remaining at the scene of an attack, and (5) definitions of common terms.

### A. Topics 1-5: Gang structure, rules, and discipline

Defendants first argue that Mr. Feeney's testimony on gang structure, rules, and discipline should be excluded because it is irrelevant, prejudicial, cumulative, and lacks foundation due to Mr. Feeney's unfamiliarity with the particular rules of the Victorville II branch of the Sureños. The Court disagrees. Specifically, Defendants seek to exclude testimony on the following topics:

> **Topic 1:** The Sureños are a prison gang comprised primarily of members of Hispanic street gangs in Southern California. Upon going into custody, Hispanic gang members are expected to affiliate with one of several prison gangs: the Sureños, the Norteños, or the Paisas. The Sureños act as foot soldiers for the Mexican Mafia. (Opp. at 8.)

> **Topic 2:** The Sureños are governed by rules adapted from the Mexican Mafia. The rules are generally consistent throughout the prison system, though there can be some variations between prisons. Indoctrination into the Sureños' rules begins when a gang member is in jail. Sureños are supposed to get up when the doors open in the morning, workout, maintain a clean cell, and shave their heads. When a Sureño goes to take a shower, another Sureño is supposed to stand outside as protection to the Sureño in the shower who would otherwise be vulnerable. (Opp. at 9.)

**Topic 3:** Any disputes between rival gang members outside of prison are suspended while in prison. Sureños are not to harm other Sureños, either physically, or by stealing or cheating them. The exception to this is that Sureños may be ordered to attack other Sureños to discipline them if ordered to do so by shot callers. Shot callers are members of the "mesa," a group of veteran Sureños who make decisions for Sureños in a particular prison. Among the most serious offenses for Sureños is to inform on other Sureños, or to testify against another Sureño. This would be even more egregious for an ex-Sureño, as he would be a double offender for turning his back on the Sureños and testifying against a Sureño. (Opp. at 10.)

**Topic 4:** Sureños will discipline members who violate their rules. For minor transgressions, this can mean a fine or performing exercises, such as doing 113 burpees. If the mesa orders a calentada, that typically consists of a beating for 13 seconds, though it can vary to up to 60 seconds. The repeated appearance of the number 13 in Sureño culture is based on the letter M, representing the Mexican Mafia, being the 13th letter in the alphabet. Sureño discipline would not include a beating for 10 minutes or that consisted chiefly of kicking and stomping on the victim'[s] head. (Opp. at 12.)

**Topic 5:** Continued use of drugs by a Sureño after being warned not to, the failure to pay for drugs provided by the Mexican Mafia for sale in the prison, the failure to pay a portion of the proceeds from drug sales up to the Mexican Mafia, the disciplining of a relative of a Mexican Mafia member, and the theft and sale of property belonging to other Sureños are all serious violations of Sureño rules. Any one of those violations could make the offender a target for killing. (Opp. at 13.)

After reviewing the testimony given during the evidentiary hearing and the parties' supplemental briefs, the Court finds that Mr. Feeney's experience has given him a sufficient basis to provide reliable testimony on the general structure, organization, rules, and discipline of the Sureños. In his twenty-five years with the Bureau of Prisons, Mr. Feeney personally investigated hundreds of murders and assaults involving Sureños. (*See* Tr. 22:3–6.) He received information about the Sureños through frequent contacts with members and associates, his own investigations, and discussions with other investigators.

(*See id.*)  Mr. Feeney can reliably use his professional experience and the information he learned from various sources throughout his career to form conclusions about the general structure, rules, and discipline of the Sureños.  The Government has therefore established that Mr. Feeney's opinions regarding the structure, rules, and discipline of the Sureños are "based on sufficient facts or data" to be reliable.  Fed. R. Evid. 702; *see also United States v. Holguin*, 51 F.4th 841, 857 (9th Cir. 2022) (finding that "the extensive and applicable experience of the government's experts reliably supported their testimony about gang and drug trafficking structure and activities"); *United States v. Hankey*, 203 F.3d 1160, 1169–70 (9th Cir. 2000) (explaining that officer's "street intelligence" gained through years of experience with gangs gave a reliable basis for his opinions about gang membership and tenets); *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008) ("[J]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group, law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations."  (citation omitted)).

In addition to being reliable, the probative value of Mr. Feeney's testimony on Topics 1 through 5 is not substantially outweighed by the danger of undue prejudice, misleading the jury, causing undue delay, or wasting time.  *See* Fed. R. Evid. 403. "Because the average juror is often innocent of the ways of the criminal underworld, expert testimony is allowed . . . to provide jurors a context" for the case and for Defendants' lives and actions.  *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011).  "Expert testimony about a gang's history, territory, . . . structure, membership rules, and similar sociological evidence can assist the jury in understanding and evaluating" the evidence before it.  *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015) (citations omitted).  At trial, the jury will be asked to understand and analyze the structure and activities of the Sureños.  Mr. Feeney's testimony on Topics 1 through 5 will help the jury with this task by imparting a basic understanding of the structure and

operation of the Sureños.  Testimony explaining the rules and concomitant discipline employed by the Sureños as an organization is also sociological evidence regarding gang culture and will help the jury understand the emphasis the Sureños place on loyalty and obedience above all else.  More importantly, the testimony will be relevant to the jury's determination of whether Defendants' motive for killing Mr. Sandez was to comply with an order given by the leaders of the Sureños.

Defendants point to Mr. Feeney's lack of knowledge about "the specific discipline rules at Victorville II" as a reason to exclude or limit his testimony on Topics 4 and 5. (*See* D. Supp. at 1–2.)  But that goes to the weight, not the admissibility, of the testimony.  To hold otherwise would be to "confuse[ ] the *credibility and accuracy* of [an expert's] opinion with its *reliability*," because "a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *In re Scrap Metal Antitrust Lit.*, 527 F.3d 517, 529 (6th Cir. 2008).  The Court's task in deciding whether Mr. Feeney's opinions are admissible is not to determine whether they are correct, but rather to determine whether they rest upon a reliable foundation, as opposed to, say, unsupported speculation.  *See* Fed. R. Evid. 702 (explaining that expert testimony must be based on "sufficient facts or data" and the "product of reliable principles and methods").  If Defendants believe that the rules or practices of the Sureños at the Victorville II facility do not align with the general rules and practices that Mr. Feeney describes, they are free to raise that during cross-examination.  *See United States v. Ledbetter*, 929 F.3d 338, 349–50 (6th Cir. 2019) (finding that arguments that the link between expert's gang knowledge and the specific practices of a local branch of the gang "go to the weight of [the] testimony and not its admissibility.")  But the Court will not exclude Mr. Feeney's testimony on that basis.

//

//

//

**B.      Topic 6: Sureños assaults**

Defendants next argue that Mr. Feeney's testimony on Topic 6, related to assaults committed by Sureños, should be excluded because it is irrelevant and improperly corroborates the testimony of cooperating witnesses.  (*See* Mot. at 8–9.)  The Court agrees.  Topic 6 includes the opinion that

> [i]t would be common for the Sureños ordered to commit an assault not to know the identity of the inmate they were going to assault until minutes before the assault.  It is also common that one or more of the persons ordered to commit or assist in the assault were friends with the victim, as that prior relationship would make it easier to catch the victim off guard.

(Opp. at 14.)

After reviewing the testimony given during the evidentiary hearing and the parties' supplemental briefs, the Court finds that Mr. Feeney has a sufficient basis to provide reliable testimony on Topic 6.  Mr. Feeney testified that he has been told by Sureños twenty-five to fifty times over the course of his career that attackers are not aware of their target until minutes before the attack happens.  (*See* Tr. 23:24–24:2.)  He further testified that he has been told approximately fifty times by both victims and attackers that the Sureños often order friends of the victim to carry out an assault.  (*See id.* 24:18–24.)  Both of these opinions are further supported by information that Mr. Feeney learned through discussions with his colleagues.  (*See id.* 24:25–25:6.)  Taken together, this is sufficient to establish that Mr. Feeney's opinion is "based on sufficient facts or data" to be reliable.  Fed. R. Evid. 702.

Again, while it may be reliable, the Court must also consider whether the probative value of the testimony is substantially outweighed by the danger of misleading the jury, causing undue delay, or wasting time.  *See* Fed. R. Evid. 403.

As an initial matter, the Government declined to address relevance in its supplemental brief, (*see* P. Supp. at 1), and thus has failed to clearly explain its theory of how Mr. Feeney's testimony on Topic 6 bears on the issue of premeditation—which, in the wake of Defendants' guilty pleas, is the critical issue to be proven at trial. The Government's failure to properly develop an argument regarding the probative value of the testimony does not require the Court to construct such an argument for it. *See Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 F. App'x 440, 449 (6th Cir. 2009) (refusing to address "arguments that . . . are unsupported or undeveloped"). On its face, the probative value of the testimony is minimal. Whether the practice of keeping a victim's identity secret until minutes before an attack (or selecting friends of the victim to carry out the attack) is "common" for the Sureños at an organizational level does not have any clear bearing on Defendants' culpability for the first-degree murder of Mr. Sandez.

Any slight probative value the testimony on Topic 6 might have "is [also] outweighed by the risk the jury might improperly consider it as independent proof (i.e., risk of misleading the jury)." *Federal Civil Trials and Evidence (Rutter Group Practice Guide)* ch. 8F-C (June 2022 Update). "Scientific or expert testimony particularly courts" the danger of misleading the jury "because of its aura of special reliability and trustworthiness." *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973). As an expert's "purported expertise narrows" from general details about a gang to the specific facts of a case, his "testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them." *United States v. Mejia*, 545 F.3d 179, 190–191 (2d Cir. 2008). An important consideration in distinguishing proper expert testimony from testimony that simply parrots the facts of the case is the generality or specificity of the proffered testimony. When gang-expert testimony descends into a discussion of specific events mirroring the events in the case, the expert is merely adding "unmerited credibility" to the Government's sources, *id.* at 192, and summarizing evidence in a way that should be

reserved for the Government's closing argument. *See United States v. Chapman*, 2015 WL 10401776, at *21 (D.N.M. Aug. 28, 2015) (holding that "[w]hen the expert opines on the basis of 'expertise' rooted in the facts of the case being tried, it is effectively arguing the case as a mouthpiece for counsel" and that "[i]t is inappropriate for an expert witness to bolster the credibility of another witness"; the use of expert testimony "which effectively serves to bolster counsel's arguments about how the jury should interpret the case's facts [is] reminiscent of, and analogous to, credibility bolstering"). Rather than serving as an aide to help the jury understand complex facts, the proposed testimony on Topic 6 would serve primarily—and impermissibly—to corroborate the Government's narrative.[2]

Also troubling, if Mr. Feeney is allowed to testify on Topic 6, the Government will be required to produce the approximately 200 autobiographies that Mr. Feeney relied on in formulating his opinion, and Defendants would have to be permitted to cross-examine him extensively about them at trial. This would result in an unnecessary sideshow, and undue delay in the trial, about what is and is not common conduct for members of the Sureños, which would do little more than draw attention away from the central issue of Mr. Sandez's murder—specifically, whether Defendants killed Mr. Sandez with premeditation. The prejudice caused by the undue delay, waste of time, and potential jury confusion that would result if Mr. Feeney's testimony on this topic was admitted clearly outweighs any conceivable probative value it might have. *See* Fed. R. Evid. 403.

//

//

//

//

---

[2]   Indeed, Mr. Feeney testified that he was aware of the cooperating witness's statement that Defendants were friends with Mr. Sandez and were not told his identity until moments before the attack.  (*See* Tr. 5:18–22.)

## C.    Topic 7: Killing without weapons

Defendants next argue that Mr. Feeney's testimony on Topic 7, related to the Sureños killing without weapons, should be excluded because it is irrelevant and improper speculation.  The Court agrees that the testimony should be excluded. Topic 7 states that

> [i]t is consistent with Sureño culture that shot callers would order a killing be done without weapons, as the use of a weapon, such as a knife or shank, would trigger a prison-wide search for the weapon or other similar weapons. A killing done by hands and feet would not provoke such an upheaval in the prison.  By the same token, if a prison gang is going to order a killing, which will result in a lockdown of the entire prison, shot callers for that gang will usually give shot callers of other prison gangs notice as a courtesy that the gang is conducting 'business' that will likely result in a shutdown.

(Opp. at 15.)

At the hearing, Mr. Feeney testified that out of the hundreds of debriefings he conducted, the issue of a murder committed by the Sureños without a weapon was only ever discussed on two occasions.  (*See* Tr. 27:18–24.)  While Mr. Feeney also testified that he has been told as much by his colleagues, (*see id.* 27:25–28:10), his dearth of personal experience and vague assertions about secondhand information do not amount to a sufficient factual basis to support a finding that the proposed opinion is reliable.  *See* Fed. R. Evid. 702.  At the same time, Mr. Feeney testified on cross-examination that most attacks in federal prisons are unarmed.  (*See* Tr. 67:1–3.)  In short, he has failed to provide a reliable basis for his opinion that killing without weapons is specifically "consistent with Sureño culture" rather than a common occurrence in federal prison.[3]

---

[3]  As Defendants point out, if this truly was the motivation for Defendants' behavior, it was a resounding failure: in response to Mr. Sandez's murder, 1,124 inmates were interviewed, thirty-two inmates were sent to the Special Housing Unit, and the facility was locked down for fourteen days. (*See* D. Supp. at 4.)

In addition to lacking reliability under Rule 702, testimony on Topic 7 would be of little help to the jury.  While sociological testimony from an expert on the general rules and culture of a gang may be useful to the jury, there is no sociological expertise required in testifying to the specific facts of the case.  *See Mejia*, 545 F.3d at 194–95.  "[D]espite the utility of, and need for," gang expert testimony, "its use must be limited to those issues where sociological knowledge is appropriate."  *United States v. Cazares*, 788 F.3d 956, 977–78 (9th Cir. 2015) (quoting *Mejia*, 545 F.3d at 190); *see also United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015).  "[E]xpert testimony is called for when the 'untrained layman' would be unable intelligently to determine 'the particular issue' in the absence of guidance from an expert."  *Mejia*, 545 F.3d at 189 (quoting Fed. R. Evid. 702 advisory committee's note to proposed rules).  It is not the case that an untrained layperson would be unable to understand, in the absence of guidance from an expert, that attacking without a weapon could be done to prevent a prison-wide search for weapons.[4] *See United States v. Flores*, 2014 WL 12686740, at *1 (N.D. Cal. June 16, 2014) (excluding gang expert testimony about committing violent acts to increase gang standing as not beyond the comprehension of most lay jurors and "more properly . . . elicited from percipient witnesses").

Furthermore, as discussed with regard to Topic 6, if Mr. Feeney is allowed to testify on Topic 7, the Government will be required to produce the approximately 200 autobiographies that Mr. Feeney relied on in formulating his opinions.  Defendants' cross-examination of Mr. Feeney regarding those documents would be a lengthy and unnecessary sideshow from the central issue of the case, and the prejudice caused by the resulting undue delay would outweigh any conceivable probative value the proposed testimony might have.  *See* Fed. R. Evid. 403.

---

[4]  Again, as Defendants point out, if this truly was the motivation for Defendants' behavior, it was a resounding failure: in response to Mr. Sandez's murder, 1,124 inmates were interviewed, thirty-two inmates were sent to the Special Housing Unit, and the facility was locked down for fourteen days. (*See* D. Supp. at 4.)

**D.    Topic 8: Attackers remaining at the scene**

Defendants next argue that Mr. Feeney's testimony on Topic 8, related to
Sureños being ordered to remain at the scene of an attack, should be excluded
because it is "merely a repeat what [Mr.] Feeney has read in reports of interviews
with potential government witnesses." (D. Supp. at 4.)  The Court agrees.  Topic 8
states that

> [i]t is not unusual that Sureño shot callers would order attackers to remain at
> the scene of an attack to be caught by correctional officers.  This holds true
> even when members are ordered to kill another Sureño.

(Opp. at 17.)  The goal of this practice is to protect the leadership of the gang, because if
an attacker is "caught at [the] incident," there may not be any need "to look further," in
which case officials "won't go after the leadership" or conduct further searches.  (Tr.
35:12–22.)

Mr. Feeney testified that he had personally been told "dozens" of times by inmates
that Sureños shot callers will order attackers to remain at the scene of an attack to be
caught by correctional officers.  (*See id*. 34:25–35:3.)  His opinion is also based on
information that he learned through discussions with his colleagues about their own
debriefings.  (*See id*. 35:7–11.)  This is sufficient to establish that Mr. Feeney's opinion is
"based on sufficient facts or data" to be reliable.  Fed. R. Evid. 702.

However, as with Topic 6, the proposed testimony on Topic 8 is inadmissible
under Rule 403 because it simply corroborates the Government's narrative.  The
testimony is tailored specifically to match the evidence in this case, in which the
Defendants remained at the scene after killing another member of the Sureños.  This is

precisely the type of made-to-order expert testimony that should not be permitted from gang experts.  As the Second Circuit warned, "it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict." *Mejia*, 545 F.3d at 191.  Mr. Feeney's testimony on Topic 8 would serve largely—if not solely—to bolster the cooperating witness's testimony.  "When the tenor of the expert's testimony is closely aligned with the facts of the case, the testimony may create an improper implication that a law enforcement specialist believes the government's witness to be credible and the defendant to be guilty." *Amuso*, 21 F.3d at 1263 (cleaned up).

Using an expert to convey the very specific information in Topics 6 and 8—information that happens to fit precisely with the testimony of the Government's cooperating witness—would run the risk of "transforming" Mr. Feeney "into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *Mejia*, 545 F.3d at 190–91.  Ultimately, whether Mr. Sandez's murder was premeditated should be proven with facts, not expert opinions.  The question of whether Defendants were acting on instructions from Sureños shot callers to murder Mr. Sandez should be proven through evidence such as the testimony of cooperating witnesses, admissions by Defendants, physical evidence, documents, videos and photographs, and recordings.

As with Topics 6 and 7, if Mr. Feeney is allowed to testify on Topic 8, the Government will be required to produce the approximately 200 autobiographies that he relied upon.  Defendants' extensive cross-examination of Mr. Feeney regarding those documents would consume a substantial amount of the jury's valuable time, at the risk of distracting the jury from the central issue of the case, whether Defendants killed Mr. Sandez with premeditation.  The prejudice caused by such undue delay would outweigh

any conceivable probative value the proposed testimony might have. *See* Fed. R. Evid. 403.

The Court's ruling that Topics 6, 7, and 8 are inadmissible under Rule 403 in no way retreats from the proposition that the general rules and culture of prison gangs are proper subjects for expert testimony under Rule 702. The Court holds only that the expert testimony must be on topics that "have esoteric aspects reasonably perceived as beyond the ken of the jury," and that "[they] cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events." *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992).

### E.     Topic 9: Definition of terms

Finally, Defendants argue Mr. Feeney should not be allowed to testify about term definition because it is unnecessary unless and until "there is testimony about these terms" and "the Court concludes that the jury may be confused about the meaning of those terms." (Mot. at 10.) Under Topic 9, Mr. Feeney will define the following terms:

- Southsider
- Mesa
- PC up – request or go into protective custody
- Cars – refers to different gangs and cliques in a prison, such as the Aryan Brotherhood or the Crips
- Kite – a note usually written on small pieces of paper to be delivered to other inmates
- Paisas – a clique or gang consisting of Mexican nationals or others who have a tie to Mexico
- Senor – a member of the Mexican Mafia

- Carnales – a member of the Mexican Mafia
- "Rack us up" – get placed in the Secured Housing Unit.

(Opp. at 17–18.)

The Court finds that Mr. Feeney's twenty-five years of experience have given him a sufficient factual basis to provide reliable testimony on commonly used terms and slang. *See United States v. Holguin*, 51 F.4th 841, 857 (9th Cir. 2022) (finding that "the extensive and applicable experience of the government's experts reliably supported their testimony about . . . the meaning of expressions familiar from those contexts"). Defendants do not argue that testimony defining the proposed terms would be irrelevant or unfairly prejudicial. Due to the likelihood that the terms will be used at some point during lay witness testimony, the Court finds that the proposed testimony on Topic 9 is admissible.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to exclude or limit Mr. Feeney's testimony is **GRANTED IN PART**. Mr. Feeney may testify on Topics 1, 2, 3, 4, 5, and 9. He will not be permitted to testify on Topics 6, 7, or 8.

DATED:    November 22, 2022

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE